**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

No. 18-6916

CHARLES NEMON VANDROSS,

Petitioner - Appellant,

v.

BRYAN STIRLING, Commissioner, South Carolina Department of Corrections, and Broad River Correctional Institution,

Respondent - Appellee.

Appeal from the United States District Court for the District of South Carolina, at Aiken. Richard Mark Gergel, District Judge.  (1:17-cv-02484-RMG)

Argued:  October 28, 2020                          Decided:  January 26, 2021

Before NIEMEYER, MOTZ, and RICHARDSON, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Motz and Judge Richardson joined.

**ARGUED:**  E. Charles Grose, Jr., GROSE LAW FIRM, LLC, Greenwood, South Carolina, for Appellant.  Michael Douglas Ross, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.  **ON BRIEF:**  Elizabeth A. Franklin-Best, BLUME FRANKLIN-BEST & YOUNG, LLC, Columbia, South Carolina, for Appellant.  Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Deputy Attorney General, J. Anthony Mabry, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellee.

NIEMEYER, Circuit Judge:

In his application for a writ of habeas corpus filed under 28 U.S.C. § 2254, Charles Vandross — who was convicted in a South Carolina state court for murder, burglary, kidnapping, and related crimes — claimed that his trial counsel's performance was constitutionally deficient under the standard established in *Strickland v. Washington*, 466 U.S. 668 (1984). He noted that his trial counsel failed to call any forensic experts to testify on his behalf and asserted that such failure was not a strategic decision but was made out of counsel's ignorance of the availability of funding to pay experts. He asserted further that his post-conviction counsel's performance was also constitutionally deficient in failing to demonstrate that his trial counsel's deficiency was prejudicial. The district court granted summary judgment to the State because Vandross failed to show prejudice not only in the state post-conviction court but also in the district court.

We granted a certificate of appealability on the ineffective-assistance issue and now affirm. Even though the district court did not restrict its review by considering only the state court record, as required in the circumstances, but instead considered an affidavit of a forensic expert that Vandross presented for the first time in the district court, we nonetheless agree with the district court's conclusion that the expert failed to show prejudice with evidence or a proffer of evidence "of what a defensive forensic expert would have testified to and how that could have altered the trial." The forensic expert only identified investigatory issues that he or another forensic expert *could* have explored and did not test or challenge any evidence actually presented to the jury so as to support a

2

conclusion that testimony from him or another forensic expert could have made a difference.

I

The proof against Vandross at his state trial in Greenwood County, South Carolina, consisted mostly of the testimony of his former girlfriend, JoAnn Suber Wilson, and forensic evidence that corroborated some of her testimony. Generally, Wilson testified that following an argument with Vandross, Vandross broke into her house, murdered the man whom Wilson was then with, and then kidnapped her at gunpoint.

More particularly, Wilson testified that after she and Vandross began dating in July 2003, Vandross moved into her house, and the two lived together on and off for the next 12 to 14 months. Eventually, though, he moved into his own apartment nearby, but he kept a key to Wilson's house. He also gave Wilson a key to his apartment. After an argument on October 31, 2004, Wilson asked Vandross to leave her house, and he did so, but he kept her key. Because she became scared of Vandross, she asked a prior boyfriend, Sanford Best, to stay with her in her house, and he agreed. The next day, on November 1, Vandross went to Wilson's workplace, and the two exchanged keys. Two days later, on November 3, Wilson received a call from a friend that prompted her that same day to seek a restraining order against Vandross. She received a no-trespassing notice. Later that day, when she and Best were watching her son's ball game, she saw Vandross, and he just "stare[d]" at them.

3

During that night, after Wilson and Best had gone to sleep in the same bed, Wilson was awakened by Vandross's hand over her mouth and a gun pointed to her head. Vandross warned her that she "better not scream." As Wilson resisted, a tussle resulted, and Vandross threw Wilson violently to the floor, bruising her and causing bleeding from her nose and mouth. She stopped resisting only after Vandross threatened to "include [her] children in it." When Vandross let Wilson use the bathroom after she had pleaded with him that she really needed to go, she took some of the blood from her wounds and attempted to write Vandross's name on the bathroom wall. She explained that she did so because she believed that Vandross was going to kill her. Vandross then threw her some of her clothes to get dressed and a roll of duct tape that he had brought with him, instructing her to put the tape over her mouth. While she did so, she spit on the tape so that it would be loose and could be removed more easily. She also left pieces of tape in the bathroom as "clues." When Vandross saw Wilson through the open door spitting on the tape, he wrapped the tape around her head "all the way down to [her] neck." She could barely breathe, as only one nostril was left open. Vandross then pushed Wilson back through the bedroom into the living room, and as they passed through the bedroom, Wilson testified that "out of the corner of [her] eye," she saw Best on the bed "with a pillow over his head." Vandross grabbed Wilson's car keys, led her through the back door, and put her into the driver's seat of her car, while taking the passenger seat. He then instructed Wilson to drive, even though she was complaining about her restricted ability to do so with the duct tape wrapped about her face.

4

Following Vandross's instructions, Wilson pulled the car into a church parking lot. But when they saw the lights on in two nearby houses, one of which was a parsonage, Vandross told Wilson, at gunpoint, to drive to a second church. After entering its parking lot, she attempted to run the car into a silver tank, but Vandross hit the brake and stopped the car. He grabbed the keys, put the car in park, and ripped the duct tape off of Wilson as he started "ranting and raving" about prior arguments during their relationship. It was now about 3:00 a.m. on November 4. Vandross related details of their past, expressed jealousies, and stated that he loved her but she didn't love him. He continued his monologue, stating, "My life is ruined, I've killed a man." When Wilson insisted that she did love him and recalled how he had said that their "hugs [were] special," she invited a hug from Vandross. He then pulled Wilson out of the car, hugged her, and started to quote scripture. She nonetheless started praying, believing still that he was about to kill her. As Vandross's temperament thus flipped, he told Wilson that he would never hurt her. He "pulled the clip out of the gun," put it in his pocket, and said, "Let's get back in the car." Observing that it was "5:50" and "time for the kids to get up," he stated that he would take her back to the house if she promised to do certain things, including taking the children outside in time for the school bus and not telling the police. During this discourse, he observed that he expected to be sentenced to only "eight to ten years for this" because it was his "first offense." When Wilson suggested that they call the police because Best might not be dead, Vandross replied, "Trust me, he's dead."

Wilson drove them back to her house, and while still parked, he instructed her to take off her outer shirt, combed her hair with his fingers, and cleaned some of the blood

5

off of her face with saliva, as one would do for a child. Wilson then went inside, woke up her sons, and got them dressed. But while inside, she also called the police. She then took her boys out front to wait for the bus. Once she heard sirens, however, she and the boys ran to meet the police.

Officer Chris Hammett testified that he found Vandross standing on Wilson's back porch. Following Hammett's command, Vandross handed over the unloaded gun, and the officer found the clip in Vandross's pants pocket. Officer James Boggs testified that, inside the house, the bedroom TV was "very loud" and that Best was lying dead on the bed with a gunshot wound to his head. Wilson testified at trial that she had never heard the gunshot.

To corroborate Wilson's testimony, the State presented forensic evidence analyzing evidence collected from the scene by an evidence technician.

The technician collected a gun residue kit from Vandross, and the subsequent test indicated that lead particles were on Vandross's shirt but that there was no detectable amount of the other two chemicals necessary to classify those particles as gunshot residue. No tests were conducted for gun residue on Wilson.

The State also conducted a series of DNA tests. A test of the gun recovered from Vandross did not reveal any DNA on the gun. Pieces of duct tape from Wilson's car had Wilson's DNA on them but not any blood or DNA from Vandross. Similarly, a test of the duct tape roll revealed Wilson's DNA on it but not Vandross's. Samples of blood taken from the bathroom belonged to Wilson. A test of Vandross's pants had Wilson's DNA on them.

6

A white shirt was recovered from the floor of Wilson's car, which had red or brown stains on it, as well as a smudge that could have been a handprint. While the technician testified that he did not know if the shirt had been submitted to testing, a DNA analyst testified that a test of the shirt found blood belonging to Best.

The technician found a stocking cap on the back porch of Wilson's house, but it was never tested. He did not attempt to collect any fiber, hair, or fingerprint evidence in the house because Vandross was known to have been a recent resident.

A firearms expert testified that the gun recovered from Vandross was the same gun that fired the bullet that killed Best, and the technician collected a shell casing from the floor next to the bed.

A forensic pathologist analyzed Best's gunshot wound and testified that the abraded skin around the hole indicated that the gun was against the skin when fired. He stated further that the gun taken from Vandross was consistent with the wound. Finally, he testified that based on his own experience of firing pistols, it "would not be unusual" for someone in the same room not to hear a gunshot when it is fired directly against the skin.

During closing argument at trial, Vandross's attorney highlighted the gaps in the forensic evidence, pointing out that testing did not identify any of Best's DNA on Vandross's hands, clothing, or gun. He similarly highlighted the absence of Vandross's DNA on the duct tape. Finally, he argued that the shell casing's location was not consistent with where Vandross would have stood to shoot Best.

Following the jury's guilty verdict, Vandross appealed, and the South Carolina Court of Appeals affirmed his conviction. Vandross then applied to the Greenwood County

Court for post-conviction relief ("PCR"), claiming, among other things, the ineffective assistance of his trial counsel in failing "to hire and interview or call to testify experts," listing experts in eight distinct disciplines. He contended that his counsel's ineffective assistance violated his rights under the Sixth Amendment, citing *Strickland v. Washington*, 466 U.S. 668 (1984). At the PCR hearing, Vandross's trial counsel testified that he did not hire any experts to testify at trial or advise him because, even though he "thought it would be very beneficial to us," he did not have the funds to do so and, he added, neither did Vandross. Vandross did not present any expert testimony at the PCR hearing to support his claim of prejudice resulting from this alleged ineffective assistance of counsel at trial because, as he testified, "we probably would have to pay for that" and "we could not guarantee what we would find."

The state PCR court denied Vandross's PCR application on the merits, explaining, as to trial counsel's failure to call any expert witnesses:

> Counsel testified he wanted to retain experts in this case, but Applicant had no funds with which to hire these experts. Counsel also testified he used the prior trial transcripts to fully cross-examine the witnesses, especially Wilson. Prejudice from trial counsel's failure to call witnesses cannot be shown where the witnesses do not testify at post-conviction relief. An Applicant must produce the testimony of a favorable witness or otherwise offer the testimony in accordance with the rules of evidence at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial. Applicant produced no such testimony of any expert witnesses at the PCR hearing, and therefore cannot show any resulting prejudice.

(Citations omitted).

On July 24, 2017, the Supreme Court of South Carolina denied Vandross's petition for a writ of certiorari to review the PCR court's ruling.

8

Vandross then filed this § 2254 application in the district court on September 15, 2017, making several claims, including that he received the ineffective assistance of counsel at trial "when trial counsel failed to obtain funding for expert witnesses." Amplifying that claim in his application, he stated:

> Petitioner's trial counsel never consulted or secured any experts for either of Petitioner's murder trials because he did not know that he could secure funding for them. Given the State's heavy reliance on forensic testimony, and the two prior [trials based on hung juries], counsel's performance was objectively both deficient and prejudicial.

Vandross asserted that his trial counsel did not make a strategic choice about the need for experts; indeed, his trial counsel conceded, when testifying at the PCR hearing, that experts would have been "very beneficial" to Vandross. Vandross argued further that the district court should not deny his application on the basis of the state's PCR ruling because his counsel in that proceeding was also ineffective. He maintained that "the procedural default" in failing to show prejudice at his state PCR hearing should be excused because state PCR counsel was ineffective in failing to hire experts to show prejudice, relying on *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (holding that, in limited circumstances, cause to excuse procedural default might be established by ineffective counsel in state collateral proceedings).

The district court approved funding for Vandross to retain a forensic expert to support his § 2254 application, and Vandross retained Dr. Rodger Morrison. Dr. Morrison submitted a two-page affidavit, which identified 14 investigatory issues that a forensic expert could have addressed at trial. He did not, however, test any evidence, concluding

9

only that if trial counsel had retained a forensic expert, "it would have undermined the integrity of the State's case against Mr. Vandross."

By order dated July 20, 2018, the district court granted the State's motion for summary judgment. It agreed with the state PCR court that Vandross failed to establish prejudice from his trial counsel's alleged ineffective assistance because he offered no expert testimony at the PCR hearing to support his claim. The court concluded further that Dr. Morrison's affidavit did not demonstrate prejudice because it "fail[ed] to offer any substantive testimony that would have served to challenge the evidence offered by the state" at trial.

Vandross filed this appeal from the district court's order, and on February 4, 2019, we granted a certificate of appealability as to his claim of ineffective assistance of trial counsel for failing to retain experts and present expert testimony at trial.

II

In his § 2254 application, Vandross claims that he received the ineffective assistance of counsel at trial "when trial counsel failed to obtain funding for expert witnesses." He maintains that his counsel did not make a strategic choice about the need for experts; indeed, his counsel conceded that he believed experts would have been "very beneficial" to Vandross. His counsel explained that he did not retain experts because neither he nor Vandross could afford to pay for them. Counsel was apparently unaware of a South Carolina statute that provides funding to indigent defendants for exactly this purpose. *See* S.C. Code Ann. § 17-3-50(B) (authorizing up to "five hundred dollars" to pay for

10

investigation and experts to assist certain indigent defendants). Vandross asserts that such an elementary mistake of law constitutes deficient performance. *See Hinton v. Alabama*, 571 U.S. 263, 273 (2014) (per curiam) (finding deficient performance where trial counsel's failure to seek additional funds for an expert witness "was based not on any strategic choice but on a mistaken belief that available funding was capped"). He also asserts that this deficiency prejudiced him at trial because experts could have testified about evidentiary holes in the State's case, which could have altered the ultimate outcome.

But this is the same claim that Vandross presented to the state PCR court and that the state court resolved on the merits. Vandross claimed in his state PCR application that he received the ineffective assistance because his counsel failed "to hire and interview or call to testify experts" in numerous distinct disciplinary areas to counter the State's evidence, including an "expert on guns," a "doctor or blood expert," a "handprint expert," a "clothing expert," and a "psychiatrist." And he claimed that he "was prejudiced by counsel's failure." Finally, he argued that "in every instance of ineffective assistance of counsel heretofore described . . . his United States Constitutional rights were violated. The Sixth Amendment guarantees the right to effective assistance of counsel in criminal prosecutions," citing *Strickland*.

The PCR court considered Vandross's claim on the merits, reciting each expert requested and the reasons why that expert was claimed to be relevant. But it also noted that "none of these 'experts' were present to testify on his behalf at the PCR hearing" to "show any resulting prejudice." In denying relief, the PCR court applied federal law, noting that it required Vandross to show (1) that his "counsel's performance was deficient,"

11

and (2) that his "counsel's deficient performance . . . prejudiced Applicant such that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,'" quoting *Cherry v. State*, 386 S.E. 2d 624, 625 (S.C. 1989) (quoting *Strickland*, 466 U.S. at 694). In concluding that Vandross failed to meet his burden, the court held, among other things, that Vandross failed to prove the prejudice prong of *Strickland*, stating:

> Prejudice from trial counsel's failure to call witnesses cannot be shown where the witnesses do not testify at post-conviction relief. *Underwood v. State*, 309 S.C. 560, 425 S.E.2d 20 (1992); *Bassett v. Thompson*, 915 F.2d 932 (4th Cir. 1990), *cert. denied*, 499 U.S. 982 (1991). An Applicant must produce the testimony of a favorable witness or otherwise offer the testimony in accordance with the rules of evidence at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial. *Bannister v. State*, 333 S.C. 298, 509 S.E.2d 807 (1998). Applicant produced no such testimony of any expert witnesses at the PCR hearing, and therefore cannot show any resulting prejudice.

In short, the state PCR court decided on the merits the very same claim that Vandross set forth in his § 2254 application.

While § 2254 authorizes federal courts to "entertain" an application for a writ of habeas corpus from a person in state custody "in violation of the Constitution or laws or treaties of the United States," 28 U.S.C. § 2254(a), it provides nonetheless that such a habeas writ may not be granted "with respect to any claim *that was adjudicated on the merits* in state court proceedings," subject to three exceptions: (1) a showing that the state court decision "was contrary to" federal law; (2) a showing that the state court decision "involved an unreasonable application of" federal law; or (3) the state court decision "was based on an unreasonable determination of the facts" in light of the record before the state

12

court, *id*. § 2254(d) (emphasis added); *Harrington v. Richter*, 562 U.S. 86, 100 (2011). Therefore, because the state PCR court adjudicated Vandross's ineffective-assistance claim on the merits, Vandross must, to obtain federal review of that claim, show one of the three exceptions to the § 2254(d) bar — specifically, as applicable here, that the state PCR decision "involved an unreasonable application of" federal law. This he has not attempted to do, nor could he.

The state PCR court correctly recited the requirements of *Strickland* and correctly applied those requirements to the facts in the record. In doing so, it also concluded correctly that no evidence was presented or offered to show prejudice in that any of the forensic evidence presented by the State at trial was flawed. While Vandross did point out various gaps in the State's evidence, he highlighted those gaps to the jury. Moreover, he did not offer or present any evidence to the state PCR court that would have filled the gaps such that it would show a reasonable probability of a change in the result. Simply, Vandross has not shown that the PCR court's decision was an unreasonable application of *Strickland* as is necessary to show an exception to the § 2254(d) bar to review a state PCR decision resolving a claim on the merits.

III

Rather than attempting to demonstrate that the PCR court's decision was an unreasonable application of federal law, Vandross argues that his failure to show prejudice at the state PCR hearing was the result of the ineffective assistance of counsel at that hearing. Like his trial counsel, his state PCR counsel failed to present any expert testimony,

13

this time as needed to show prejudice from his trial counsel's failure to do so. Because of that deficiency, Vandross argues, he should be excused from demonstrating that the PCR court unreasonably applied federal law, and he requests instead that the federal court perform collateral review of the issue. In making his argument, he recognizes the general rule that because he was not constitutionally entitled to counsel during his state post-conviction proceedings, he "cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991). He instead seeks to justify federal review by calling his counsel's deficiency in the state PCR proceeding a procedural default that justifies application of the narrow exception provided by *Martinez v. Ryan*, 566 U.S. 1 (2012). In *Martinez*, the Court held that a federal court may review a procedurally defaulted ineffective-assistance claim when (1) the state PCR court is the first occasion for raising the claim, (2) the petitioner's counsel provided ineffective assistance in the PCR court, and (3) it is likely that no state court will hear the prisoner's claim. *Id.* at 18. To support federal review justified by the *Martinez* exception, Vandross requested funding from the district court to retain an expert for the federal proceeding — a request the court granted — and then presented the affidavit of Dr. Morrison to show prejudice resulting from his trial counsel's deficiency. The district court considered the affidavit over the objection of the State in resolving Vandross's § 2254 application.

Vandross's argument to excuse his failure to show prejudice at the state PCR hearing raises two issues. Can Vandross supplement the state court record in the federal court on the ground that his state PCR counsel was deficient, relying on *Martinez*? And

14

does the record, even when so supplemented, sufficiently support a showing of prejudice? We address these in order.

## A

As a general rule, our review under § 2254(d) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *see also Moore v. Stirling*, 952 F.3d 174, 181 (4th Cir. 2020). This rule flows directly from the text of § 2254, which "focuses on what a state court knew and did." *Pinholster*, 563 U.S. at 182.

Vandross nonetheless insists that Dr. Morrison's affidavit may be considered because his failure to present evidence of prejudice at his state PCR hearing was itself the product of the ineffective assistance of his state PCR counsel. In making this argument, he seeks to apply cases involving the doctrine of procedural default, analogizing his PCR counsel's failure to a default. Normally, if an applicant does not present a claim to a state court and that court does not have an opportunity to consider it, review by a federal court is barred because the claim is procedurally defaulted. *See Coleman*, 501 U.S. at 731–32. But, as Vandross correctly argues, the Supreme Court has recognized a "narrow exception" to that rule in *Martinez*, 566 U.S. at 9. As the *Martinez* Court stated, a federal court may review a "substantial" ineffective assistance of counsel claim, notwithstanding procedural default, when state law required that the claim be raised in the state "initial-review collateral proceeding" and, in that initial proceeding, "there was no counsel or counsel in

15

that proceeding was ineffective." 566 U.S. at 17; *see also Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (identifying the four elements necessary to apply the *Martinez* exception).

In effect, Vandross requests that we carry the *Martinez* exception to procedural default over to this case to provide an exception to the distinct rule that our review under § 2254 "is limited to the record that was before the state court." *Pinholster*, 563 U.S. at 181. This request, however, is foreclosed.

We have already held on more than one occasion that *Martinez*, which authorizes a federal court to consider a new *claim* that was procedurally defaulted, does not provide a similar exception for new *evidence* supporting a claim that was in fact presented in state court. *See, e.g.*, *Gray v. Zook*, 806 F.3d 783, 789 (4th Cir. 2015) ("[I]f claims are not procedurally defaulted — that is, they were properly presented to the state court — then *Martinez* does not apply"). Other courts of appeals have uniformly reached the same conclusion. *See, e.g.*, *Escamilla v. Stephens*, 749 F.3d 380, 395 (5th Cir. 2014) ("[O]nce a claim is considered and denied on the merits by the state habeas court, *Martinez* is inapplicable, and may not function as an exception to *Pinholster*'s rule that bars a federal habeas court from considering evidence not presented to the state habeas court"); *Moore v. Mitchell*, 708 F.3d 760, 785 (6th Cir. 2013) ("[Applicant] is not asking that we afford a *Martinez*-like review of a procedurally defaulted claim, but rather that we turn *Martinez* into a route to circumvent *Pinholster*"); *Floyd v. Filson*, 949 F.3d 1128, 1147–48 (9th Cir. 2020) (same).

In *Gray*, we held that, just like here, a federal court deciding a § 2254 claim may not consider an expert affidavit submitted to the district court after the applicant failed

16

previously to submit such evidence to the state court in order to prove that trial counsel's failure to call expert witnesses prejudiced the applicant's trial. *Gray*, 806 F.3d at 798–99. That rule, though, applies only when the federal habeas claim is "fundamentally the same" as the claim presented to the state court. *Moore*, 952 F.3d at 182. By contrast, in limited circumstances, "new evidence [can] 'fundamentally alter' the 'substance' of the claim so as to make the claim a new one" that was not presented to the state court. *Id.* at 182–83 (cleaned up) (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986)). But that does not occur where the new evidence does not "change the heart of the claim" but instead "merely strengthens the evidence presented in the state PCR hearing." *Id*. at 184; *see also Gray*, 806 F.3d at 799 (recognizing "that a petitioner may not support a claim in state court with mere conjecture and subsequently provide the necessary evidentiary support for the claim on federal habeas review").

In this case, Vandross did not procedurally default his ineffective-assistance claim before the state PCR court. Rather, he attempted to present it fully, arguing both his counsel's deficiency and resulting prejudice. He simply sought, in the federal court, to supplement the evidence in support of that claim in order to better show prejudice. Thus, while Dr. Morrison's affidavit might have strengthened Vandross's ineffective-assistance claim, it did not "fundamentally alter" it. *Gray*, 806 F.3d at 799.

Accordingly, our review is limited to the state PCR court's record, and the district court's consideration of Dr. Morrison's affidavit was error. On that record, Vandross's § 2254 application must be denied, as shown above. Nonetheless, the district court's

17

conclusions about the substance of Dr. Morrison's affidavit were completely valid, and we affirm on that basis also.

B

Vandross relies almost exclusively on Dr. Morrison's affidavit to establish in federal court that his trial counsel's deficient performance resulted in prejudice. He argues that it shows that his trial counsel never subjected Wilson's account "to scientific scrutiny" and that there is a reasonable probability that doing so would have resulted in a different outcome.

In his affidavit, Dr. Morrison states that "either I, or another forensic investigator, *could have assisted* trial counsel in challenging the forensic evidence in this case. In my opinion, law enforcement did not undertake a very thorough investigation, and I (or another forensic investigator) *could have assisted* trial counsel in bring[ing] this to the jury's attention." (Emphasis added). He then lists 14 distinct issues that *could* have been challenged at trial or *could* have been investigated further. He concludes, "Had trial counsel or PCR retained counsel [retained me or another forensic investigator] for purposes of challenging the forensic science testimony and the lack of physical evidence in this case, I believe it would have undermined the integrity of the State's case against Mr. Vandross."

Remarkably, Dr. Morrison did not himself test, or have some other expert test, any of the relevant evidence. He did not even use his expertise to speculate as to what such testing would have found. Instead, he simply put forth a menu of options that a forensic expert *could* have explored in greater depth. Yet, from the substance of Dr. Morrison's

18

affidavit, Vandross reasons that if an expert had so explored the list of options, the expert would have uncovered some form of evidence that may well have altered the jury's verdict. But he has pointed to nothing specific.

More is required. When a petitioner's ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, we require "a specific proffer . . . as to what an expert witness would have testified." *Goins v. Warden, Perry Corr. Inst.*, 576 F. App'x 167, 173 (4th Cir. 2014) (per curiam). A petitioner's failure to do so "reduces any claim of prejudice *to mere speculation* and is fatal to his claim." *Id.* (emphasis added); *see also Bassette v. Thompson*, 915 F.2d 932, 940 (4th Cir. 1990) ("The great failing of the appellant on his claim that other evidence should have been presented during the sentencing phase of his trial is the absence of a proffer of testimony from a witness or witnesses he claims his attorney should have called"); *Beaver v. Thompson*, 93 F.3d 1186, 1195 (4th Cir. 1996) ("[A]n allegation of inadequate investigation does not warrant habeas relief absent a proffer of what favorable evidence or testimony would have been produced").

The South Carolina courts require the same. *See Bannister v. State*, 509 S.E.2d 807, 809 (S.C. 1998) ("This Court has repeatedly held a PCR applicant *must produce the testimony* of a favorable witness *or otherwise offer the testimony in accordance with the rules of evidence* at the PCR hearing in order to establish prejudice from the witness' failure to testify at trial"); *Porter v. State*, 629 S.E.2d 353, 358 (S.C. 2006), *abrogated on other grounds by Smalls v. State*, 810 S.E.2d 836 (S.C. 2018) ("Mere speculation of what a witness' testimony may be is insufficient to satisfy the burden of showing prejudice in a

petition for PCR"); *Clark v. State*, 434 S.E.2d 266, 267 (S.C. 1993) ("[P]ure conjecture" about how an expert witness would testify is not sufficient "to establish the result would probably change if a new trial is had").

Without proffering any evidence of what an expert would have concluded, Dr. Morrison's affidavit suffers from what these cases describe as mere speculation. The affidavit identifies only where a forensic expert *could* have looked for exculpatory evidence, but it failed to present that exculpatory evidence — or even proof that it exists — to establish prejudice. In short, Dr. Morrison's affidavit, even if properly considered, would not have helped Vandross's claim, as the district court concluded.

\* \* \*

We conclude that Vandross has failed to establish that the state PCR court's decision involved an unreasonable application of federal law when it concluded that Vandross failed to prove the requisite prejudice for his ineffective assistance of counsel claim and therefore that the district court did not err in denying his § 2254 application.

AFFIRMED