**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 20-4**

JAMES NATHANIEL BRYANT, III,

Petitioner - Appellee,

v.

WARDEN MICHAEL STEPHAN, Broad River Correctional Institution; BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections,

Respondents - Appellants.

Appeal from the United States District Court for the District of South Carolina, at Aiken. Bruce H. Hendricks, District Judge.  (1:13-cv-02665-BHH)

Argued:  January 25, 2021               Decided:  May 24, 2021

Before NIEMEYER, WYNN, and THACKER, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Wynn joined.  Judge Thacker wrote a dissenting opinion.

**ARGUED:**  Michael D. Ross, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants.  Lindsey Vann, JUSTICE 360, Columbia, South Carolina, for Appellee.  **ON BRIEF:**  Alan Wilson, Attorney General, Donald J. Zelenka, Deputy Attorney General, Melody J. Brown, Senior Assistant Deputy General, Caroline Scrantom, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA, Columbia, South Carolina, for Appellants. Elizabeth Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellee.

NIEMEYER, Circuit Judge:

During a traffic stop in Horry County, South Carolina, James Bryant turned to the police officer, wrestled him to the ground, beat him unconscious with the officer's flashlight, and then, using the officer's pistol, shot the officer in the head. After a manhunt, Bryant was arrested the next day and charged with first-degree murder and armed robbery. The jury found him guilty on both counts, and he was sentenced to death for the murder and 20 years' imprisonment for the robbery.

After exhausting his state remedies, Bryant applied to the district court under 28 U.S.C. § 2254 for habeas relief, and the court vacated his death sentence. The court concluded that the state postconviction court (1) unreasonably determined that a juror who was hearing impaired was competent to sit on the jury and unreasonably applied clearly established federal law in so concluding; and (2) unreasonably concluded that Bryant's state trial counsel was not ineffective in allowing the hearing-impaired juror to sit on the jury. But the district court rejected a claim by Bryant that his trial counsel was ineffective for failing to press a *Batson* challenge.

Because we conclude that the district court did not give effect to the proper standard in overruling the state postconviction court, we vacate the district court's rulings on the issues pertaining to the hearing-impaired juror. On Bryant's *Batson*-based claim of ineffective assistance, we affirm. We remand with instructions to deny with prejudice Bryant's federal application for habeas relief.

2

# I

Bryant was first convicted and sentenced to death in a South Carolina state court in 2001, but the South Carolina Supreme Court reversed, based on a procedural error, and Bryant was retried. At his retrial in 2004, a jury again found Bryant guilty on both counts, and again he was sentenced to death for the murder and to 20 years' imprisonment for the robbery. This time the South Carolina Supreme Court affirmed. *See State v. Bryant*, 642 S.E.2d 582, 589 (S.C. 2007).

Bryant thereafter sought postconviction relief in state court, alleging, among other things, that one of the jurors in his second trial — Juror 342 — suffered from a hearing impairment that caused her to miss portions of the testimony. He claimed (1) that the inclusion of this juror on the jury violated his due process right to an impartial and competent jury and (2) that his trial counsel was constitutionally ineffective in failing to seek the juror's removal. Following an evidentiary hearing, the state postconviction court denied Bryant relief, holding (1) that Juror 342's hearing impairment was not so severe that she missed material testimony, and (2) that defense counsel, knowing of the juror's impairment, made a strategic decision to keep her on the jury. The Supreme Court of South Carolina denied Bryant's petition for a writ of certiorari.

Bryant then filed a federal application for a writ of habeas corpus in the district court under 28 U.S.C. § 2254. In addition to his two claims involving Juror 342, he also made eight other claims, including, for the first time, that his trial counsel ineffectively argued that the state solicitor struck four Black jurors at trial on account of their race, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986). Bryant's habeas application was referred to a

3

magistrate judge, who issued a report and recommendation that the district court deny Bryant's application and grant the State's motion for summary judgment. After Bryant filed objections to the report and recommendation, the district court sustained some of them, finding that the state postconviction court had unreasonably found facts and unreasonably applied clearly established federal law with respect to Juror 342's participation on the jury. *Bryant v. Stirling*, No. CV 1:13-2665-BHH, 2019 WL 1253235 (D.S.C. Mar. 19, 2019). According to the district court, "Juror 342 was not competent and should have been excused" because of her "disability," *id.* at *18; her presence on the jury violated Bryant's "bedrock constitutional right to a competent jury," *id.* at *20; and "there was no valid strategy" in keeping her on the jury, *id.* at *24 (emphasis omitted). Accordingly, the court vacated Bryant's sentence of death, but found that the errors were harmless as to his guilty verdicts because "the State's proof of Petitioner's guilt was ironclad." *Id.* at *16, *22. As for the *Batson*-based ineffective assistance claim, the district court adopted the magistrate's report and recommendation and held that Bryant did not show cause to overcome his procedural default of that claim. *Id.* at *35–36.

The State appealed the district court's ruling on the two claims involving Juror 342, and Bryant argues in response that the relief the district court granted is also supported by his *Batson*-based ineffective assistance claim.

II

On Bryant's due process claim, the State contends that the district court "starkly departed from the state [postconviction] court," which should have been "afforded

4

deference [on the issues] because the record supports the state [postconviction] court's denial of relief." It maintains, moreover, that there is no Supreme Court decision that controls the outcome of whether Juror 342's continued service on the jury violated Bryant's due process rights.

Section 2254 authorizes federal courts to "entertain" an application for a writ of habeas corpus from a person in state custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). But § 2254 "is not to be used as a second criminal trial, and federal courts are not to run roughshod over the considered findings and judgments of the state courts that conducted the original trial and heard the initial appeals." *Williams v. Taylor*, 529 U.S. 362, 383 (2000). In this vein, § 2254 provides that a habeas writ may not be granted "with respect to any claim that was adjudicated on the merits in State court proceedings," unless one of three exceptions is shown: (1) that the state-court decision "was contrary to" federal law; (2) that the state-court decision "involved an *unreasonable* application" of federal law; or (3) that the state-court decision "was based on an *unreasonable* determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d) (emphasis added); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Vandross v. Stirling*, 986 F.3d 442, 449 (4th Cir. 2021).

To say that an application or a determination is "unreasonable" is not to say simply that it is *wrong*. *See, e.g.*, *Williams v. Stirling*, 914 F.3d at 302 (4th Cir. 2019); *Harrington*, 562 U.S. at 102 ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable"). An "unreasonable application of federal law" refers to applications that are "objectively unreasonable," *Owens v. Stirling*, 967 F.3d 396, 411 (4th

5

Cir. 2020) (cleaned up), that is, applications that are "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103; *see also White v. Woodall*, 572 U.S. 415, 419–20 (2014). And "unreasonable determinations of the facts" are made when they are "sufficiently against the weight of the evidence that [they are] objectively unreasonable." *Williams*, 914 F.3d at 312 (quoting *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010)). Moreover, "[s]tate court factual determinations are presumed correct and may be rebutted only by clear and convincing evidence." *Id.* (citing 28 U.S.C. § 2254(e)(1)).

As apparent from the text, these § 2254(d) standards are "meant to be" "difficult to meet," *Harrington*, 562 U.S. at 102; they are a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (cleaned up). Thus, to conduct the analysis prescribed by § 2254, "federal habeas courts must make as the starting point of their analysis the state courts' determinations of fact, including that aspect of a 'mixed question' that rests on a finding of fact." *Williams*, 529 U.S. at 386.

Accordingly, we turn first to the state postconviction proceedings in this case. On the Juror 342 issue, the postconviction court found, following an evidentiary hearing, that:

> [Juror 342] did have some hearing deficiencies. She had a problem with hearing in the right ear, however, she could hear. Both the State and the Defendant qualified her without objection after having reviewed the returns. There is no question but that she had some problem with hearing, however, she was able to compensate for that by reading the lips of the particular witness. She specifically testified at the — during one of the inquiries

conducted by the trial judge that she had, indeed, heard all the testimony thus far in the sentenc[ing] phase.

The court then explained how the state trial judge accommodated Juror 342 by instructing witnesses to look at the jury panel and speak loudly and how the judge also instructed everyone in the courtroom to notify her if there was a problem. The court also noted that counsel for both parties expressly stated that they wanted Juror 342 to remain on the jury and that the state trial court found her qualified. The postconviction court observed further that "it was never determined that [Juror 342] missed any material testimony or that she was not qualified." In its formal order following the postconviction hearing, the postconviction court stated:

> This Court finds there was not a sufficient showing that [Juror 342] missed material testimony at trial or that her hearing difficulty was of such degree as to indicate she missed material [testimony]. Therefore, this due process claim is denied.

Challenging the state postconviction court's findings of fact and application of federal law, Bryant contended in his § 2254 application that his Sixth, Eighth, and Fourteenth Amendment rights were violated when he was convicted and sentenced to death by a jury that included a "hearing impaired juror who did not hear portions of the trial testimony." He argued that because Juror 342 "did not hear all of the testimony presented at either phase of the trial" — a "fact not disputed" — he was denied "[a] fair trial in a fair tribunal" and therefore was denied due process. Bryant did not, however, cite any federal decision, much less a Supreme Court decision, where a hearing impairment disqualified a juror from participating in a trial. He argued instead that because due process, as a general

7

matter, requires "a panel of impartial, indifferent jurors" and "a fair tribunal," he was denied due process by having a juror "who did not hear portions of the trial testimony."

The district court agreed with Bryant, concluding that:

> It was unreasonable for the PCR court to find that Juror 342 was qualified to serve on the jury, that she heard all testimony during the guilt phase, and that there had not been a sufficient showing that her hearing difficulty was of such degree as to cause her to miss material testimony.

*Bryant*, 2019 WL 1253235, at *16. But in reaching that conclusion, the district court made its own extensive findings of fact, stating that it was unreasonable for the state postconviction court "*to credit* Juror 342's statements." *Id*. at *19 (emphasis added). Indeed, throughout its lengthy opinion, the district court made findings in disagreement with the findings made by the state postconviction court. For instance, the district court found that after the state trial judge instructed the jury to alert the court "if they were having trouble hearing," the fact that "Juror 342 [n]ever once" did so showed that "Juror 342 was either unwilling or incapable of volunteering the undisputed truth that she was having difficulty hearing," *id*. at *17 (emphasis omitted), although it was Juror 342 who mentioned her hearing problem in the first place. This was but one reason the district court found that it was "unreasonable for the [state] PCR Court . . . to credit Juror 342's statements that she 'heard all testimony.'" *Id*. at *19. The district court ultimately expressed agreement with Bryant's assertion that Juror 342 was "functionally deaf," *id*. at *21, and that "no reasonable fact finder could conclude that Juror 342's hearing deficit was inconsequential," *id*. at *20. Based on this and other factfinding, the district court concluded that Juror 342 was "not competent" to sit on a jury and "should have been excused." *Id*. at *18.

8

The district court clearly disagreed with the findings of fact made by the state postconviction court, and it did so by collecting *some* of the evidence to support its position. But it failed to take account of much of the evidence relied on by both the state trial judge and the state postconviction court — especially the numerous conversations that took place between the trial judge and Juror 342, during which Juror 342 clearly heard and understood what the judge was saying and responded to it. To demonstrate this, we describe in some detail the record that reflects the interactions between Juror 342 and the court, which, to be sure, does include some troubling exchanges.

The record shows that Juror 342 suffered from a hearing impairment that first came to light during voir dire. After the judge questioned Juror 342 — when Juror 342 sometimes appears to have misheard the judge or was confused about the questions but ultimately engaged in a discussion with the judge and answered every question — the state solicitor asked Juror 342 about her juror form, on which she had indicated that she "had a hearing problem" with her right ear. J.A. 108. Juror 342 affirmed as much but said that she could hear the attorney fine. J.A. 108. And while a few seconds later she asked the solicitor to repeat a question, she ultimately engaged in a discussion that illustrated that she could hear his questions. J.A. 109. Bryant's lead defense counsel did not question Juror 342 on anything, and both the solicitor and defense counsel then told the court that they found Juror 342 qualified to serve. J.A. 112–13. The judge agreed, called Juror 342 back into the courtroom, and told her to "pack [her] bags for ten days" in case she was selected from among the 40 qualified to serve. J.A. 113.

9

Final jury selection took place the following Monday, and Juror 342 was ultimately selected to serve on the jury. J.A. 143. The guilt phase began later that same day. After opening statements and after six witnesses had testified, the judge asked Juror 342 if she could hear. J.A. 179. Juror 342 indicated that she was having trouble hearing but said, "Long as I'm looking, you know, facing you I can read your lips and understand what you're saying." J.A. 179. The judge asked if she "really ha[d] to read lips to understand . . . [b]ecause there's been plenty of times that they have turned away. Have you heard all of the evidence and testimony in this trial?" J.A. 180. Juror 342 responded that she did have to read lips to understand others, but that she had "heard" everything so far. J.A. 180. The judge was satisfied with that answer, and told the parties, "All right, we need to be very mindful that she is actually reading lips. That's assisting her. So, we'll have to . . . have our witnesses actually looking that direction and facing" the jury. J.A. 180. The judge then instructed Juror 342 that "[i]f at any time you don't understand or can't hear you need to let us know." J.A. 180. Juror 342 said that she understood and would do so. J.A. 180.

At the end of the first day of trial, the judge once again instructed Juror 342 that "if you have any problems you know to let us know." J.A. 183. The judge said that she was "focusing on" Juror 342 "because I know you're lip reading." J.A. 183. Juror 342 said that she understood. J.A. 183.

After the jury was dismissed, the judge conferenced with the solicitor and defense counsel and told them:

I've got some concerns about the one juror who is lip reading. . . . I have concerns that it was not brought to light that she really needed to lip read when we were doing the individual voir dire. . . . Now, that would not preclude her from serving. My concern is that it hasn't come to our attention until recently and I've asked her about whether she has missed anything, but I'm going to be very mindful of that and ask that you all be very mindful of that as well. In other words, when you're asking questions sometimes you're going to have to be looking over at that jury.

I'm going to periodically make sure that all are able to hear and watch that situation as best I can. I'm also going to hear from the SLED agents [the South Carolina Law Enforcement Division agents monitoring the trial and the jury] . . . to see . . . if they get any indication that she's really having difficulty even lip reading, and then if that is the case then we will address that. . . .

I just wanted to raise that issue because . . . there was a couple of things. She didn't hear me say that she was to pack her bags for ten days. So, she did not pack her bags for ten days. So, she missed that, although she did hear to be here today and to be here at ten o'clock . . . . So, we've got to watch this situation pretty closely. Be aware that I'm aware of it. . . . We're going to try to adapt as much as we can to be sure that she's able to.

J.A. 185–87. The solicitor and defense counsel made no objection to what the judge said. J.A. 187.

The next day, after a few witnesses had testified, the judge asked the jurors if "everybody [was] able to hear, and specifically are you able to hear with them turning this way?" J.A. 190. Juror 342 indicated that she could hear. The judge again told Juror 342 to raise her hand if she had any problems. J.A. 190.

Before the court recessed for lunch that day, the judge conducted an impromptu hearing test, asking the jurors to raise their hands if they were *not* having difficulty hearing the testimony. J.A. 192–93. Juror 342 was slow to respond. The judge noticed this delay and asked Juror 342, "Can you hear, are you able to hear?" J.A. 193. Juror 342 said,

11

"Yeah." J.A. 193. The judge asked if Juror 342 had "been able to hear all of the testimony." J.A. 193. Juror 342 said that she had "heard them all." J.A. 193.

The State rested its case later that day. Bryant presented no case in defense and the jury began deliberations at 4:53 p.m. It reached a verdict on guilt at 5:40 p.m.

The penalty phase began two days later. On the second day of the penalty phase, the trial judge conducted another impromptu hearing test by instructing the jurors to stand based on the color of their clothing. J.A. 640–41. Juror 342 stood at the right time, but the solicitor thought he saw that she needed a nudge from another juror to do so. J.A. 791. The solicitor accordingly asked the judge to excuse Juror 342 because he did not "think she [was] following part of the trial testimony." J.A. 791. The judge agreed that she "had . . . concerns" about Juror 342's ability to hear, although the SLED agents had "indicated that they thought" Juror 342 was able to hear. J.A. 792. The judge decided to conduct another test the next day. J.A. 792.

The next day, after the State had finished presenting its case in aggravation, the solicitor noted that he "still continue[s] to be concerned about [Juror 342's] apparent deafness and inability to follow all the testimony." J.A. 853. The judge again agreed to hold another hearing test, explaining that "there have been some things that have brought or caused the Court some concern, times when it looks like maybe . . . she's not watching back and forth [to lip read] and she's not able to hear." J.A. 853.

The judge's third hearing test involved having the jurors stand based on the color of their clothes. Juror 342 was wearing a navy-blue dress. When the judge asked everyone in a green shirt to stand, Juror 342 rightly remained seated. J.A. 855. When the judge then

12

asked everyone in a skirt or dress to stand, Juror 342 rightly stood up. J.A. 856, 857. But when the judge asked "everyone in blue" to stand, Juror 342 remained seated. J.A. 856, 857. The judge then dismissed the jury and conferenced with the parties.

After the solicitor, defense counsel, and the judge decided that Juror 342 might have been confused about whether she was wearing navy blue or black, the judge called Juror 342 back in for more questioning. Juror 342 admitted that she considered her dress to be blue. J.A. 862. The judge asked if she had ever "turn[ed] away and miss[ed] part of a question or an answer." J.A. 861. Juror 342 responded that she had. J.A. 861.

Judge:      So, you have missed some of the evidence and testimony?

Juror 342:  No, ma'am, I heard it, but it's more like when I — after I heard the testimony I turned my head, you know, [to] concentrate on it.

Judge:      Okay, now, listen carefully to this question. Have you found yourself turning away and looking and missing part of a question or part of an answer because you didn't, you didn't turn your head fast enough?

Juror 342:  Yes, ma'am.

*      *      *

Judge:      [Y]ou have been through one phase of this trial and that is the guilt phase of this trial. Now, did you hear all of the evidence and testimony in that phase?

Juror 342:  Yes, ma'am.

Judge:      Did you ever catch yourself missing part of a question or an answer in that phase of the trial?

Juror 342:  Just at one point I thought I missed a little of it but I didn't. I thought about it and I haven't missed it.

Judge:      So, you didn't miss anything?

Juror 342:   No, ma'am.

Judge:      [I]s this the phase where you've found yourself turned away and have missed some when we started this part?

Juror 342:   No, ma'am.

Judge:      Okay, have you, in fact, turned away and missed some evidence and testimony . . . at this point?

Juror 342:   I may have missed a little of it but I didn't miss everything.

Judge:      Okay, all right, so . . . you did miss some at this phase?

Juror 342:   Yes, ma'am.

Judge:      Do you believe that you missed any at the guilt phase?

Juror 342:   No, ma'am.

Judge:      Did you find yourself in that same situation where you had turned away and then you've missed some of the question being asked or some of the answer?

Juror 342:   Yes, ma'am, I may have missed concentrating, you know, just steady, may have missed some of it, yes, ma'am.

Judge:      You may have missed some testimony at the guilt phase?  Is that what you're saying?

Juror 342:   Yes, ma'am.

J.A. 861–63.

After Juror 342 was dismissed from the courtroom, the solicitor immediately renewed his request that Juror 342 be excused because "[s]he's admitted that she may have missed evidence at the guilt and penalty phase." J.A. 863.  Defense counsel responded that he "[thought] if you brought every juror out they would say at one point in time they've

14

missed something." J.A. 864. The judge decided to call Juror 342 back in for more questioning. J.A. 865.

> Judge: [W]hen I was asking you all to stand up if you had on a green shirt or to stand up if you had a dress on and you stood when I asked . . . to stand up if you had a dress on. I also asked everyone who had on blue to stand. Did you hear that question?
>
> Juror 342: Yes, ma'am.
>
> Judge: You heard it? Why didn't you stand?
>
> Juror 342: You said — asking me did I hear it? Oh, no, ma'am.
>
> Judge: You didn't hear when I asked if you have on . . . blue stand?
>
> Juror 342: No, ma'am.
>
> Judge: Okay, and you were looking directly at me and I was talking —
>
> Juror 342: That's what I was trying. I was trying to read your lips when you was like talking.
>
> Judge: Okay, who's your doctor that deals with your hearing problem?
>
> Juror 342: This one, my right ear.
>
> Judge: It's your right ear? Who's your doctor?
>
> Juror 342: Excuse me?
>
> Judge: Who's your doctor?

J.A. 866.

After Juror 342 left the courtroom to find her doctor's contact information, the judge told the parties that

> there's no question. She has indicated she just flat did not hear and I was looking directly at her and talking and even now she's having difficulty

15

hearing me and I'm raising my voice and there's been a lot quieter voices than mine during the trial of this matter.

J.A. 867. The judge then held an off-the-record meeting, during which she unsuccessfully attempted to contact Juror 342's doctor. J.A. 868. After the meeting and back on the record, the judge noted that the parties agreed

that all jurors can be somewhat distracted at some time and [there has been] no indication that she has not been able to hear the testimony. The indication has been, in fact, that she has been hearing most and has turned away and only missed bits, but she has admitted to missing some.

J.A. 868. The solicitor then withdrew his motion to excuse Juror 342, explaining that he thought that Juror 342 "is qualified," that she "heard most of what was going on," and that "she is able to follow the testimony" and "was able to properly deliberate." J.A. 869. Defense counsel "agree[d] one hundred percent with" the solicitor, stating that he thought "she heard" and "that if you brought all 11 of them out they probably would miss something somewhere along the line, too." J.A. 869–70.

Bryant presented additional evidence regarding Juror 342's hearing impairment at the postconviction evidentiary hearing. Juror 342's husband testified that Juror 342 had had hearing problems since the 1980s. J.A. 1040. He offered a few anecdotes of her impairment, like being unable to hear at church or when she was standing just a few feet from her husband at home. J.A. 1040–41. Notably, however, he did not specify whether Juror 342's hearing difficulties had gotten worse over time; how bad they were at the time of trial in 2004; or whether any of the examples he provided to demonstrate Juror 342's hearing difficulties were from around the time of trial, or were more recent. The husband

16

also testified that Juror 342 is "sensitive about her hearing problem" and that she "get[s] furious" when told she needs a hearing aid. J.A. 1040, 1042.

Bryant did not call Juror 342's ear, nose, and throat doctor or an audiologist at the postconviction hearing to testify as to the extent of Juror 342's hearing problem. He did, however, submit an affidavit by Dr. Desmond McGann, a family-practice doctor who saw Juror 342 for foot pain two years after the trial and who found Juror 342 at the time to be "partially deaf." J.A. 962. The doctor did not, however, "conduct a hearing test using medical equipment designed to measure deafness." J.A. 962.

Based on this record, the state postconviction court rejected Bryant's fair-trial claim, explaining:

> This Court finds that [Juror 342] was qualified to serve on the jury without objection. [Juror 342] testified she heard all testimony during the guilty phase and was able to compensate for her hearing deficiencies. The trial court also took specific measures to ensure that [Juror 342] was able to hear the testimony. Additionally, South Carolina Courts have held that a person who has difficulty hearing is not per se disqualified from serving as a juror. *Safran v. Meyer*, 103 S.C. 356, 364, 88 S.E. 3, 4 (1916).

> This Court finds there was not a sufficient showing that [Juror 342] missed material testimony at trial or that her hearing difficulty was of such degree as to indicate she missed material [testimony]. Therefore, this due process claim is denied.

J.A. 1275.

This record makes plain that the trial judge was aware of Juror 342's hearing impairment. Indeed, the judge was actively involved in ensuring that Juror 342 could understand the proceedings and questioned Juror 342 several times as to her ability to hear. While the judge did express concerns that Juror 342 was having trouble hearing, the judge

17

ultimately concluded that "[t]he indication has been . . . that she has been hearing most and has turned away and only missed bits." J.A. 868. Indeed, Juror 342 participated effectively in several extensive dialogues with the judge. Accordingly, the judge — with the full backing of the solicitor and defense counsel, both of whom agreed that "all . . . jurors can be somewhat distracted at some time" and thereby miss some testimony — decided that Juror 342 remained fit to serve. J.A. 868.

Given the trial judge's superior position in assessing Juror 342's competency, we owe that decision considerable deference. *See, e.g.*, *United States v. Dempsey*, 830 F.2d 1084, 1088 (10th Cir. 1987) (in case about hearing-impaired juror, explaining that a juror's "ability to perceive and weigh the evidence is best evaluated by the trial judge"); *United States v. Tegzes*, 715 F.2d 505, 509 (11th Cir. 1983) (same); *United States v. Sears*, 663 F.2d 896, 900 (9th Cir. 1981) (same); *see also United States v. Fulks*, 454 F.3d 410, 430 (4th Cir. 2006) (explaining that the trial court's finding that a juror was credible and could "carefully weigh all the evidence" is "entitled to deference"). To be sure, the evidence relating to the severity of Juror 342's hearing impairment and what Juror 342 might have missed was sometimes equivocal. On the one hand, Juror 342 missed the judge's instruction to pack for ten days; failed one of the judge's impromptu hearing tests; told the judge that she had missed "some" testimony; and evinced a difficulty hearing the judge once during a one-on-one exchange. Her husband also presented anecdotal evidence of her hearing issues. Finally, Dr. McGann's affidavit noted that she suffered from partial deafness. But on the other hand, Juror 342 did show up for trial on time (an instruction that was given in tandem with the packing instruction); passed at least two hearing tests;

18

and was able to communicate, for the most part, during one-on-one questioning. Moreover, everyone at trial — the judge, the solicitor, the defense team, and the SLED agents — concluded that Juror 342's hearing impairment was not severe.

Based on this record and in light of the deference owed the trial judge, who was on the scene, and the postconviction court under § 2254(d), the federal habeas court should not have concluded that the postconviction court's factual findings regarding Juror 342's ability to hear were "sufficiently against the weight of the evidence" so as to be "objectively unreasonable" under § 2254(d). *Williams*, 914 F.3d at 312 (cleaned up). Instead, there is evidence in the record supporting the postconviction court's findings. The record shows that Juror 342 was found qualified by the trial judge, who had the opportunity to consider Juror 342's hearing impairment in person and in real time. The record further shows that Juror 342 testified that she missed only "some" testimony, and there is no indication that that included any *material* testimony. And finally, the record shows that Juror 342 affirmed to the judge multiple times that she could hear, that she passed several hearing tests, and that she could generally converse with the judge during one-on-one questioning. This supports the postconviction court's factual finding that Juror 342's lip-reading accommodation generally worked and that her hearing impairment was not so severe that she *must* have missed material testimony.

While the district court's own findings on the record clearly differed from the postconviction court's, such findings are not what matters in a § 2254 proceeding. "A state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Burt v. Titlow*, 571

19

U.S. 12, 18 (2013) (cleaned up).  Section 2254 instead allows federal courts to reconsider the underlying facts only in the narrowest of circumstances, as we described, and the state postconviction court's findings are "presumed to be correct."  28 U.S.C. § 2254(e)(1). They may be rebutted only by "clear and convincing evidence."  *Id*.  Such a showing was not made here.

The remaining question — whether, in ruling on the issue, the postconviction court unreasonably applied federal law "as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d) — is more fluid because Bryant has identified no Supreme Court decision that has applied due process principles to the circumstance where a juror is hearing impaired.  During the state postconviction proceedings, Bryant correctly recognized that due process requires that a defendant be given "a fair trial in a fair tribunal," meaning that the defendant have "a panel of impartial, indifferent jurors."  He argued that "[t]his right to an impartial jury necessarily implies that juries are free from physical infirmities that would interfere with their competency" and thus "[d]ue process implies a tribunal both impartial and mentally competent to afford a hearing," quoting *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912).  He concluded that "[a] juror who is unable to hear testimony does not satisfy a defendant's right to a fair and impartial jury."

The state postconviction court, in turn, did not disagree with Bryant on the law, stating that in "any trial . . . a litigant is entitled to an impartial[] and mentally competent jury."  The court added that jurors "don't have to be perfect and there can be deficiencies, and the fact that [a] person has some hearing deficiencies does not make [the person] disqualified to serve."  The court's formal order is similar.  It recognized that the relevant

20

law imposes the "impartial and competent jury" standard but denied relief after finding Juror 342 qualified and competent to sit.

In his federal application for habeas relief, Bryant did not take issue with the state postconviction court's articulation of the law. He made the same due process argument to the district court, using the same language and citing the same cases, that he had made to the state postconviction court. And the district court agreed to that articulation of law, summarizing that "[e]very criminal defendant is entitled to a jury that is both impartial and competent to adjudicate his case. The right to a competent jury necessarily implies that jurors are free from physical infirmities that would interfere with, or prevent, their ability to properly receive and consider evidence." (Citation omitted).

The question before us thus requires us to focus on the *application* of these accepted legal principles. Bryant asserts that Juror 342 was so hearing impaired that she could not fulfill her role to serve as a "competent" juror. That argument, however, actually reduces to a fact question, first answered by the postconviction court's finding that Juror 342 *was* competent to serve but then reversed by the district court when it concluded that she was not. The line between juror competency and incompetency is indeed murky, but we can safely conclude that the postconviction court did not *unreasonably* apply federal law in denying Bryant's due process claim. Rather, after it found that Juror 342 "heard all testimony during the guilty phase and was able to compensate for her hearing deficiencies" and that "there was not a sufficient showing that [Juror 342] missed material testimony at trial or that her hearing difficulty was of such degree as to indicate she missed material

21

[testimony]," it was justified in concluding that her presence on the jury did not violate Bryant's right to a competent jury.

We agree with Bryant, as well as the district court, that due process does include a requirement that a defendant be tried by a "competent jury, which means a jury capable of 'rendering an impartial verdict, based on the evidence and the law.'" (Quoting *Peters v. Kiff*, 407 U.S. 493, 501 (1972)); *see also Tanner v. United States*, 483 U.S. 107, 126 (1987) ("This Court has recognized that a defendant has a right to 'a tribunal both impartial and mentally competent to afford a hearing'" (quoting *Jordan*, 225 U.S. at 176)); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (explaining that the right to a fair trial requires that the jury base its verdict "upon the evidence developed at the trial"). But competency has an open texture, and what that means in terms of a juror with a hearing impairment like Juror 342's has never been addressed. Thus, in light of the more general due process standards that are applicable, we must give the state courts "more leeway" in "reaching outcomes in case-by-case determinations." *Owens*, 967 F.3d at 415 (ultimately quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

We thus conclude that the postconviction court did not unreasonably apply federal law in determining that Juror 342's presence on the jury did not violate Bryant's right to a competent jury. In reaching this conclusion, we note that the situation can, in some respects, be likened to when a juror is found to be sleeping. In such cases, we have explained that a juror should be removed if the juror's slumber "makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial." *United States v. Johnson*, 409 F. App'x 688, 692 (4th Cir. 2011) (quoting *United States v.*

22

*Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000)). But "a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror." *Id.* (cleaned up). In *Johnson*, for example, we found no error because "[a]t worst, the record reflect[ed] that the juror was tired and perhaps inattentive for an undefined period of time during the Defense's opening argument and the informant's direct testimony." *Id.* Here too, we know only that Juror 342's hearing impairment caused her to miss "a little" testimony. At the least, *Johnson* shows that it is not "so obvious that" Juror 342's presence on the jury violated Bryant's right to a competent jury "that there could be no 'fairminded disagreement' on the question." *White*, 572 U.S. at 427 (quoting *Harrington*, 562 U.S. at 103).

In sum, with respect to Bryant's due process claim, we conclude that the state postconviction court did not unreasonably apply federal law as determined by the Supreme Court of the United States and did not unreasonably determine the facts in light of the record. *See* 28 U.S.C. § 2254(d). We thus reverse the district court's ruling on the issue.

III

The State also challenges the district court's ruling that Bryant's trial counsel was ineffective in failing to insist on the removal of Juror 342 in light of her hearing impairment, arguing that the court similarly violated the standards imposed by § 2254(d) by not giving sufficient deference to the state postconviction court.

The state postconviction court found, based on the record, that:

Counsel's decision not to request [Juror 342] excused was a strategic decision. Counsel explained that he did not excuse [Juror 342] because he

23

did not like the alternate jurors who would replace [Juror 342]. Counsel also stated he did not approve of the selection process because it was conducted as a paper strike. Overall, [Bryant] failed to show Counsel's reasons for keeping [Juror 342] was not a valid strategic decision.

The court cited to and applied *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Under *Strickland*, Bryant was required to show that his trial counsel's decision not to exclude Juror 342 was "outside the wide range of professionally competent assistance" and that it was not a "strategic choice[]." *Id*. at 690. "Strategic choices," the Court held, are "virtually unchallengeable." *Id*. at 690–91.

But the district court again reversed the postconviction court's conclusion, disagreeing with the postconviction court's findings of fact. The court rejected the multiple reasons given by Bryant's trial counsel for making his strategic decision as "mak[ing] no sense as justifications to ignore the presence of an incompetent juror." *Bryant*, 2019 WL 1253235, at *22. In this manner, the court chose to focus on counsel's explanation that his decision to keep Juror 342 on the jury was motivated in part on her race, which matched Bryant's. The court found that that did not constitute a valid strategy. Indeed, the court ultimately concluded that "*there was no valid strategy* to retain a juror whose hearing was substantially impaired." *Id*. at *24. These findings are not only beyond the district court's role in a § 2254 proceeding, but they also rest on its own credibility determinations.

What the record does show and what the district court essentially discarded is that while Bryant's defense counsel knew that Juror 342 was having difficulty hearing and had missed "some" testimony, he nonetheless pushed to keep her on the jury, offering various explanations for this decision. He said during the postconviction hearing that Juror 342's

ability to pass one of the hearing tests "was one of the considerations to keep her," which is consistent with the position he took during trial when he argued that Juror 342 "heard everything" "in the guilt phase" and that while "she missed a little something in the penalty phase, . . . maybe 11 other jurors missed a little something, too." Bryant's defense counsel also testified that the defense team was "a little angry about the way the jury was picked" — which involved using a "paper strike" method, the details of which are not relevant, and which, according to counsel, resulted in Juror 342 being the only Black juror. Defense counsel explained that he took that into account, given that Bryant was also Black. In fact, however, the makeup of the jury included two Black jurors. Finally, Bryant's defense counsel testified at the postconviction hearing that the defense team did not "particularly care[] for the alternate," although he added that his understanding was that dismissing Juror 342 at the penalty phase would result in a mistrial. In short, the record shows that after being made aware of Juror 342's hearing issues and after observing her in person and in real time, Bryant's trial counsel concluded that the benefits of having Juror 342 on the jury outweighed the risk that she had missed some testimony.

It is apparent from the record that defense counsel's decision to keep Juror 342 on the jury was not so beyond the pale that every fairminded jurist would conclude that it was unsound trial strategy. *See, e.g.*, *Valentino v. Clarke*, 972 F.3d 560, 581 (4th Cir. 2020). The composition of a jury is a delicate matter, one that trial lawyers are particularly attuned to and that courts of review are particularly ill-suited to second-guess (or in this case, third-guess). *See generally* Ellen Kreitzberg, *Jury Selection: The Law, Art and Science of Selecting a Jury* (Nov. 2020 Update). Here, defense counsel made the on-the-ground

25

decision that his client's chances of avoiding death were better with Juror 342 on the jury than off. And given the postconviction court's determination that Juror 342's hearing was not so severely impaired that she was incompetent to serve as a juror, that court's conclusion that defense counsel's decision satisfied *Strickland* is well within the bounds of reasonableness, as required under § 2254(d).

In sum, we conclude that the state postconviction court's denial of Bryant's ineffectiveness claim was not unreasonable, either as a matter of fact or as a matter of law. *See* 28 U.S.C. § 2254(d). Therefore, we also reverse the district court's ruling on this issue.

IV

Bryant advances, as an additional ground for affirmance of the relief granted by the district court, a claim that his trial counsel was ineffective in properly arguing a *Batson* claim. *See Jennings v. Stephens*, 574 U.S. 271, 276–801, 802 (2015) (permitting habeas petitioner to raise additional grounds for affirmance of the relief sought despite not having filed a cross-appeal or obtained a certificate of appealability).

Because Bryant did not make this argument to the state postconviction court, it is, as he recognizes, procedurally defaulted. *See Fowler v. Joyner*, 753 F.3d 446, 460 (4th Cir. 2014). He seeks, however, to excuse this procedural default by relying on *Martinez v. Ryan*, 566 U.S. 1, 17 (2012). *Martinez* requires Bryant to establish "(1) that his [*Batson*-based] claim [of ineffective assistance] is substantial and (2) that [his postconviction counsel's] failure to raise it was deficient" under *Strickland*. *Owens*, 967 F.3d at 423.

26

On this issue, the district court adopted the magistrate's report and recommendation, which concluded that Bryant had presented no evidence showing that postconviction counsel was ineffective and that Bryant had failed to show that the underlying ineffective-assistance claim was substantial.

During jury selection, the state solicitor used four of his five peremptory strikes to remove four Black potential jurors, and Bryant's trial counsel challenged these strikes under *Batson*. The trial judge determined that defense counsel had demonstrated a prima facie case of discrimination and accordingly ordered the solicitor to give race-neutral reasons for his strikes. After the solicitor stated that he struck two of the Black potential jurors because of their criminal records and the other two because they equivocated on the death penalty, the judge accepted the reasons as race neutral and offered Bryant's counsel the opportunity to expose them as pretextual. While Bryant's counsel repeated that the solicitor had struck four of the seven Black potential jurors, he did not offer any further evidence of pretext. The court accordingly denied defense counsel's motion.

Bryant contended for the first time in his federal habeas application that his counsel's failure to argue pretext constituted ineffective assistance under *Strickland*, reasoning that "it is apparent from the record that counsel did not understand the three-step process of a *Batson* challenge and believed his work to be done when he made a *prima facie* case." He maintained that had his counsel been competent, "he would have been able to expose the strike of" one of the Black jurors —Juror 247 — "as pretextual" on the basis, as he argues, that while the solicitor stated that he had struck Juror 247 because she vacillated on the death penalty, he did not strike a White potential juror — Juror 123 —

27

who had expressed similar, if not greater, hesitation.  According to Bryant, a competent lawyer would have made this argument, "and the *Batson* challenge would have been successful."

*Strickland* requires that we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  466 U.S. at 689.  Bryant argues that his counsel failed to satisfy this standard by not arguing pretext.  But he says nothing further about what the record showed on that issue or about his counsel's motive or strategy.  Indeed, a cold review of the record suggests at the least that Juror 247's reticence to impose the death penalty was greater than Juror 123's, meaning that this potential pretext argument likely had no basis.  *See Keel v. French*, 162 F.3d 263, 272 (4th Cir. 1998) (explaining that if "there is ample evidence in the record to suggest racially neutral reasons for excusing" the struck jurors, then counsel's failure to object is not objectively unreasonable under *Strickland*).  In a similar vein, his defense counsel may also have wanted Juror 247 off the jury for another reason.  There is simply no evidence in the record, one way or the other, and "it should go without saying that the absence of evidence cannot overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance."  *Burt*, 571 U.S. at 23 (cleaned up).

In short, we conclude that Bryant has failed to satisfy the requirement of *Martinez* that his underlying *Batson*-based claim of ineffective assistance was sufficiently substantial to allow us to excuse his procedural default of that claim.  So, on this issue, we affirm the district court.

*     *     *

28

For the reasons given, we reverse the district court's rulings on Bryant's claims relating to Juror 342, and otherwise affirm. Accordingly, we remand this case to the district court with the instruction to deny Bryant's application for habeas relief under § 2254 with prejudice.

AFFIRMED IN PART; REVERSED IN PART;
AND REMANDED WITH INSTRUCTIONS.

THACKER, Circuit Judge, dissenting:

James Nathaniel Bryant ("Petitioner") was sentenced to death by a hearing-impaired juror ("Juror 342") who consistently failed to hear the proceedings during each stage of Petitioner's trial. In considering whether his death sentence should stand, the state postconviction relief court ("PCR Court") relied on factual findings that were "sufficiently against the weight of the evidence" and "objectively unreasonable." *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019) (internal quotation marks omitted). The district court recognized as much, and I cannot join the majority in reversing its reasoned conclusion.

Specifically, pursuant to the Antiterrorism and Effective Death Penalty Act ("AEDPA"), I would affirm the district court's conclusion that the PCR Court's decision regarding Juror 342's competency was based on "an unreasonable determination of the facts in light of the evidence presented" and factual findings that were incorrect "by clear and convincing evidence."[1] 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

The PCR Court based its decision on the following findings: (1) Juror 342 "testified she heard *all testimony* during the guilty phase"; (2) she "was able to compensate for her hearing deficiencies"; (3) the trial court "took specific measures to ensure that Juror [342] was able to hear the testimony"; and (4) there "was not a sufficient showing that [she] missed material testimony or that her hearing difficulty was of such degree as to indicate she missed material [testimony]." J.A. 1275 (emphasis supplied). But to the contrary,

---

[1] Because I would affirm the district court's grant of habeas relief on this ground, I do not address the ineffective assistance of counsel claims Petitioner raised in his habeas petition.

Juror 342 testified she missed testimony during both the guilt and penalty phases, the evidence demonstrates she was not able to compensate for her hearing deficiencies, and there was no logical way to ascertain what type or how much "material" testimony she missed.

Therefore, I respectfully dissent.

I.

Section 2254(d) provides that habeas relief "shall not be granted" unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). It is elementary that, pursuant to AEDPA, the state court's decision is not deserving of deference if it is based on unreasonable factual findings. *See Lopez v. Smith*, 574 U.S. 1, 7 (2014) (per curiam). This makes sense because if the state court reached a legal conclusion based on erroneous facts, that legal conclusion is wholly misinformed. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015) (vacating and remanding court of appeals denial of habeas relief, explaining, "[b]ecause we agree that the state court's [adjudication] was premised on an 'unreasonable determination of the facts' within the meaning of § 2254(d)(2), we need not address" the petitioner's argument on § 2254(d)(1)). As explained below, the factual determinations on which the PCR Court

31

relied in rendering its decision are objectively unreasonable, and the PCR Court's legal decision based thereon should not stand.[2]

A.

Trial Proceedings

In determining whether the PCR Court's adjudication was based on an unreasonable determination of the facts, "we train our attention on the . . . underlying factual determinations on which the [state] court's decision was premised," *Brumfield*, 135 S. Ct. at 2276: that is, Juror 342 testified she heard *all testimony* during the guilty phase; she was able to compensate for her hearing deficiencies; the trial court took measures to ensure that she was able to hear the testimony; and she did not miss material testimony. But the evidence of a hearing impairment that affected Juror 342's ability to hear the trial proceedings -- despite the trial court's assistance -- is pervasive. As the majority itself recognizes, there were unquestionably "troubling exchanges." *Ante* at 9. Indeed, as detailed below, Juror 342 failed to hear the proceedings at every stage of Petitioner's trial.

---

[2] I agree with the district court that any errors as to Petitioner's guilty verdict were harmless, as "the State's proof of Petitioner's guilt was ironclad." *Bryant v. Stirling*, No. CV 1:13-2665-BHH, 2019 WL 1253235, at *16 (D.S.C. Mar. 19, 2019). Therefore, like the district court, I would vacate the death sentence only and remand for resentencing.

1.

Voir Dire

Jury selection[3] in the state court trial began on September 29, 2004. "[T]roubling exchanges" occurred right off the bat. *Ante* at 9. During the voir dire proceedings, Juror 342's answers to various questions by the trial court were the first indicators of a hearing problem:

> [THE COURT]: [Y]ou were handed a witness list. . . . Did you recognize any of these potential witnesses as being related to you by blood or marriage or being personal or business acquaintances of yours?
>
> [JUROR 342]: Yes, ma'am.
>
> Q: Who? Who is related to you by blood or marriage or who is a personal or a business acquaintance?
>
> A: Oh, I'm sorry, no ma'am.

J.A. 98.

> [THE COURT]: . . . If you're under oath and you're told that you must apply the law as I instruct it whether you agree with it or not . . . could you do that?
>
> [JUROR 342]: No, ma'am.
>
> Q: Okay, you would not apply the law as instructed? Is that what you're saying?
>
> A: Ma'am?

---

[3] The same jury sat for the guilt and sentencing phases of Petitioner's trial. Under South Carolina law, a jury must be unanimous in delivering a death sentence. *See* S.C. Code Ann. § 16-3-20(C).

Q: You would not apply the law as instructed?

A: Oh, no, I wouldn't -- answer to the best of my ability, you know. I wouldn't tell nothing that's not true.

Q: Okay, now, I'm not asking you about telling anything that's not true. Listen to my question very carefully. I will instruct you as to the law at the close of both phases of this case.

A: Uh-huh[].

Q: You have to apply the law as I instructed it.

A: Oh.

Q: And you'd indicated that you would listen to the law and you would apply that law. . . .

A: Yes.

J.A. 98–99.

[THE COURT]: [A] Defendant is presumed innocent until his guilt has been proven beyond a reasonable doubt. The Defendant doesn't have to prove himself innocent. Do you understand that?

[JUROR 342]: No ma'am.

Q: You don't understand that? Let me explain it to you. You listen carefully.

A: Okay ---

Q: A Defendant is presumed innocent.

A: Uh-huh[].

Q: He's sitting there an innocent man. He's presumed innocent until his guilt is proven beyond a reasonable doubt. Do you understand that?

34

A: Yes, ma'am. He's innocent until he's proven guilty.

J.A. 101.

[THE COURT]: [C]ould you, based on the facts and circumstances and the law instructed, could you find the Defendant either guilty or not guilty?

[JUROR 342]: Guilty.

Q: Okay, you're saying guilty. I'm not asking you to guess which one because you don't know the facts of the case.

A: No.

Q: I'm just saying could you find them either guilty or not guilty depending on the facts, one or the other, could you find that?

A: What you saying regardless if I hear the facts or not?

Q: No, I'm saying, I'm asking you after you've heard the facts, but you don't know what they are now, can you then make a determination that he's either guilty or not guilty? That's after you've heard the facts.

A: No, ma'am.

Q: Could you do that?

A: No, ma'am.

Q: You couldn't say that he was guilty or not guilty?

A: I could say not guilty until I hear it, yes.

Q: Right, you're right. They're presumed innocent, they're presumed not guilty till you hear, but what I'm asking you is at the guilt phase you and your fellow jurors have to decide if the State met their burden of proof. If the State did not meet its burden of proof you would have to find the Defendant not guilty. Could you do that?

35

A: Yes, ma'am.

J.A. 102–04.

> [THE COURT]: Okay, if you are chosen to serve as a juror in this case you will be housed in a motel during the course of the trial. It may be up to ten days. I don't anticipate it'll be that long, but I'll have you pack for ten days. Except for the personal inconvenience that this would pose[,] would this pose any serious danger to the health or well-being of yourself or those dependent upon you?
>
> [JUROR 342]: Yes, ma'am.
>
> Q: It would? Would it pose a serious danger to the health or well-being of you or someone who is dependent on you if you were in a motel?
>
> A: No, ma'am.
>
> Q: It won't?
>
> A: No.
>
> Q: Okay, now, you've answered me both ways and I need to clarify this like I've done on some of these others.
>
> A: I understand what you're saying.
>
> . . .
>
> Q: Okay, will it? Will it cause any undue hardship for you to be housed in a motel during this trial?
>
> A: No, ma'am.

J.A. 106–07.

Next, the Solicitor asked Juror 342 about her responses to the juror questionnaire, specifically, the fact that Juror 342 indicated she had a hearing problem:

> [SOLICITOR]: Okay, all right, and I notice that in the last

36

question there about whether you had a mental or physical condition that might make you unable to serve you said that you had a hearing problem with your right ear.

[JUROR 342]: Yes, sir; yes.

Q: And I notice a couple of times when the Judge was talking to you[,] you kind of put your hand up there.

A: Yeah, so I can focus.

Q: All right, and can you tell us -- can you hear at all out of that ear?

A: Yeah, I can hear.

Q: Okay, can you hear me okay when I'm talking?

A: Yes, sir.

J.A. 108. At the conclusion of voir dire, both the Solicitor and defense counsel deemed Juror 342 to be qualified. The trial court told Juror 342 that she needed to return on Monday at 10:00 and told her, "I need for you to pack your bags for ten days. . . . [C]ome Monday at ten o'clock with your bags packed assuming you'll be chosen." *Id.* at 113. The trial court then told Juror 342, "[Y]ou can leave your baggage and all out in the car if . . . you want to do that. . . . You don't have to drag it all in." *Id.* at 114.

Juror 342 was selected as a member of the jury on Monday, October 4, 2004, and the guilt phase began. She did not have her bags packed.

2.

<u>Guilt Phase</u>

Following the jury being sworn, the trial judge provided a number of general instructions, including the following:

37

Another important hand signal, because you are the judge of the facts of the case, is this [raising hand or finger] and this means 'Judge, I cannot hear or I cannot see.' I'll figure out which one it is and I'll make sure that that witness speaks up or that attorney speaks up or I speak up or that that document or photograph or exhibit is better displayed to you, the jury.

J.A. 177–78. The parties made opening statements, and seven of the State's witnesses testified. At that point, the trial judge sua sponte questioned the jury, and specifically Juror 342, about whether they could hear properly:

THE COURT: While we wait on [the next witness] to come, let me ask you is every member of the jury able to hear? If you are able to hear just raise your hand for me. I need to be sure that everybody is able to hear. All right, let me ask you once again, is every member of the jury panel able to hear? Is every member of the jury able to hear? All right, I'm getting an indication that one juror is unable to hear; is that correct? Are you having difficulty hearing? You are?

[Juror 342]: Yes.

THE COURT: Have you been having difficulty hearing throughout this trial?

[Juror 342]: Long as I'm looking, you know, facing you I can read your lips and understand what you're saying.

**THE COURT: All right, so, you really have to read lips to understand?**

**[Juror 342]: Yes, ma'am.**

**THE COURT: Because there's been plenty of times that the[] [witnesses] have turned away**. Have you heard all of the evidence and testimony in this trial?

[Juror 342]: I heard.

THE COURT: Okay, I don't mean to put you on the spot because we will work with you. I just want to make sure you

38

haven't missed anything thus far. Have you heard?

[Juror 342]: Yes, ma'am.

THE COURT: You can, okay. All right, we need to be very mindful then that she is actually reading lips. That's assisting her. So, we'll have to be -- have our witnesses actually looking that direction and facing. If at any time you don't understand or can't hear you need to let us know. Do you understand that?

[Juror 342]: Yes, ma'am.

J.A. 179–80 (emphases supplied). Of note, the trial court made this announcement that witnesses should face the jury while testifying *after seven witnesses had already testified*.

At the end of the first day of trial, the trial judge gave additional instructions to the jury, and specifically told Juror 342:

> [M]a'am, you're going to have to get clothes. You're going to have to pack and be ready as well. You've got to get your clothes packed. So, they'll probably take you to get your clothes packed sometime this evening for ten days. You need to pack for ten days. You understand? I don't anticipate it'll be that long but I need for you to be packed that long. Everybody else is packed for ten days.

J.A. 183.

Upon dismissing the jury for the evening, the trial judge openly expressed her concerns about Juror 342 to the Solicitor and defense counsel:

> THE COURT: All right, I want you to know that I've got some concerns about the one juror who is lip reading. I want to be sure -- I have concerns that it was not brought to light that she really needed to lip read when we were doing the individual voir dire. ***She indicated she had a hearing problem but said it was taken care of, that she, in fact, could hear, but now I'm understanding that she, in fact, lip reads***. Now, that would not preclude her from serving. My concern is it hasn't come to our attention until recently and I've asked her about whether she

39

has missed anything, but I'm going to be very mindful of that and ask that you all be very mindful of that as well. In other words, when you're asking questions sometimes you're going to have to be looking over at that jury.

I'm going to periodically make sure that all are able to hear and watch that situation as best I can. I'm also going to hear from the SLED[4] agents . . . to see if there is -- if they get any indication that she's really having difficulty even lip reading, and then if that is the case then we will address that. Hopefully that will not be the case and simply being aware of it and looking towards her and making sure that she's able to hear everything will work and that will be sufficient. I just wanted to raise that issue because I want to let you know that when they went to pick her up there was a couple of things. ***She didn't hear me say that she was to pack her bags for ten days***. So, she did not pack her bags for ten days. So, she missed that, although she did hear to be here today and to be here at ten o'clock, and she did come, but she came with, I think, an aunt and a niece and without bags packed. So, she is going to have to be taken to get her bags packed. So, we've got to watch this situation pretty closely. Be aware that I'm aware of it. Anything that I hear that is reported through this court you will become, you will be made aware of it immediately if I think it's a concern about her ability to serve. We're going to try to adapt as much as we can to be sure that she's able to.

J.A. 185–87 (emphases supplied).

During the next day of trial, October 5, 2004, the continuation of the guilt phase, the

trial judge again questioned the jurors about their ability to hear:

THE COURT: . . . . I have been told that lunch has arrived and ladies and gentlemen of the jury, I will allow you to go back to the jury room at this time with a reminder please do not discuss the case. Before I send you back I'm going to ask you one more time is everybody having -- are there any problems seeing or hearing anything? Are you having any problems? If you're

---

[4] South Carolina Law Enforcement Division ("SLED") agents were helping with the jury at the trial.

40

having any problems -- let me put it this way, if you're not having any problems seeing or hearing raise your hand.

All right, all right, now, ma'am, you delayed. Can you hear, are you able to hear?

[Juror 342]: (Indicates affirmatively.) Yeah.

THE COURT: Have you been able to hear all of the testimony?

[Juror 342]: I heard them all.

J.A. 192–93. The State concluded its guilt-phase evidence later that day. Petitioner did not present any guilt-phase evidence. The jury began deliberating at 4:53 p.m., and returned a guilty verdict at 5:40 p.m.

3.

Penalty Phase

After a 24 hour statutory waiting period, *see* S.C. Code Ann. § 16-3-20(B), the penalty phase began Thursday, October 7, 2004. During this phase, the State argued the following aggravating factors to support the sentence of death: (1) Petitioner committed the murder while in the commission of a robbery and while armed with a deadly weapon; (2) the murder was committed while in the commission of larceny with use of a deadly weapon; (3) the murder was committed while in the commission of physical torture; and (4) the murder of a local law enforcement officer during or because of the performance of his official duties.

In response, defense counsel presented mitigation evidence, including: (1) the crime was out of character for Petitioner; (2) Petitioner was "extremely remorseful for his crime"; (3) Petitioner was a good, caring person whom others trusted; (4) Petitioner suffered

41

extreme beatings from his father as a child; (5) Petitioner had a remarkably positive history in prison, including that Petitioner intervened to disarm another prisoner who had a shank; (6) expert testimony that Petitioner could live safely and successfully in prison for life; and (7) Petitioner came from a large and dedicated family that would incur needless suffering if Petitioner were executed. J.A. 1597–98.

On Friday, October 8, 2004, the trial judge briefly interrupted the sentencing-phase proceedings and interjected the following exercise to test whether the jurors were hearing properly:

> THE COURT: While [the next witness] is coming forward let me ask is everybody able to hear? Everybody able to hear me? All right, if you're able to hear me raise your hand. All right.
>
> . . .
>
> THE COURT: [Witness is seated.] Please be seated. If you have, if you're in the jury box and you have on a yellow shirt would you stand up. You might need to look at your shirt to decide. Would you stand up if you have on a yellow shirt. I'm not picking on you, just whoever has on a yellow shirt stand up.
>
> All right, if you . . . happen to have on a green shirt or you have green in it would you stand up. I know this seems unusual, but bear with me. Thank you. [Y]ou can be seated. If you have on a blue shirt would you stand up? If you have on a blue shirt. You might want to look at your shirt, but if you have on a blue shirt would you stand up? All right, thank you. We'll continue.

J.A. 640–41. Juror 342, who had on a blue shirt, stood at the proper time, although it appeared the juror beside her might have nudged her. *See id.* at 791 (Solicitor: ***"I think the juror beside her to her left . . . was trying to help her, nudged her."*** (emphasis supplied)).

42

Near the end of the penalty phase, and after more than 30 witnesses had testified in that phase, the Solicitor moved to excuse Juror 342.

> [Solicitor]: . . . . Your Honor, the final thing I would like to bring up is that I would move at this time to excuse Juror 342[.] I don't think -- ***I think she's following part of the trial testimony. I don't think she's catching all of it.*** Your Honor had gone through an exercise to test her hearing ability at one point and she did not stand up when you asked about the blue blouse until . . . I think the juror beside her to her left ---
>
> THE COURT: I, I don't know. I watched that carefully.
>
> [Solicitor]: --- was trying to help her, nudged her.
>
> THE COURT: It looked like she was starting to stand up when the juror was nudging. So, it was really hard to gauge. I'll tell you what I will do. I will do another similar test and I know that seemed real odd and I'm glad that you've mentioned it. I did do a test. I have been watching her and I just want to be assured that she's able to hear. I will do it again tomorrow, and hopefully we'll have nobody, hopefully she'll be sitting by someone else and nobody nudging and I'll try that once again. I have been asking about it. I have asked the SLED agents who have been watching, who have been seeing them in the evenings, too, whether she's able to hear and they've indicated that they thought she could, ***but I have had my concerns*** and that's the reason that I had that unusual request of the jurors that if you have on a yellow shirt stand or a blue shirt and it was exactly that reason, to test her, and I am unsure whether she was beginning to stand when she was nudged or whether she was nudged to stand. I think the appropriate thing to do is try it again, and I certainly note your motion and we'll take it up, remind me tomorrow and we'll take it up again tomorrow depending on the results that we get.

J.A. 791–92 (emphasis supplied).  The trial court tested the juror's hearing in a similar way the following day, Saturday, October 9, after prompting by the State.  With only one mitigation witness remaining, the Solicitor said:

43

SOLICITOR: Your Honor, the only other item the State would wish to bring up at this time would pertain to the juror since we're running towards the end of this trial, Juror 342, [] ***I still continue to be concerned about her apparent deafness and inability to follow all the testimony.***

THE COURT: All right, and what I said I would do in that regard is that I would call them out and I'm going to have to go through a type of a test as I did yesterday either with the color of their shirt or pants or the color of their hair, something creative to try to see whether she's able to hear because ***there have been some things that have brought or caused the Court some concern, times when it looks like maybe she's . . . not watching back and forth and she's not able to hear***.

J.A. 853 (emphases supplied). The Solicitor noted, "[I]t's again kind of late in the process to be doing that, [I could suggest] maybe make some inquiry whether or not she has a physician that attends her with her hearing problem and maybe have some court personnel contact that physician to find out just how bad her problem is." *Id*. at 854. And the court said, "I'll be glad to do that." *Id*. In any event, the court proceeded to conduct another hearing test:

THE COURT: . . . . We're going to do an exercise once again today. So listen very carefully as I ask you these questions[.] If there are any gentlemen with green shirts on would you stand?
. . .

THE COURT: Very good, you may be seated.
. . .

THE COURT: If we have any ladies who are wearing skirts or dresses would you please stand[?]
. . .

THE COURT: And we do have several and you look very nice I might add. Please be seated.
. . .

44

THE COURT: . . . . All right, now, I think I see some --
everyone in blue please stand.

. . .

THE COURT: All right, you may be seated.

. . .

THE COURT: All right, ladies and gentlemen, I'm going to
send you back to the jury room for just a moment. We will have
you out in the very near future. You may go back at this time.
Do not discuss the case.

(Whereupon, the following takes place outside the presence of
the jury.)

THE COURT: Juror Number 342, . . . first of all let me note on
the record that she responded . . . when I asked about the ladies
who were wearing skirts or dresses. She got up for that and she
responded to that and it looked like without any nudging or
coaxing at all. I was watching for that very carefully. ***What she
didn't respond to was my next question about blue. She's in
a navy blue [sic]. It's dark. She may consider it black, but it's
blue. I don't know whether she didn't answer because, and
unfortunately she wasn't in a bright blue color, but she didn't
answer because she believe[s] she's in black or she didn't
answer because she didn't hear me.***

J.A. 855–57 (emphases supplied). After further discussion with counsel, it was decided

the trial court would speak with Juror 342's doctor. Defense counsel suggested that Juror

342 had failed to respond to the trial court's direction to "stand if wearing blue" because

she was confused by the fact that, although her garment was blue, it had polka dots on it.

*Id.* at 858. The trial court again suggested that it could be because she considered it black,

and many people have difficulty differentiating between navy blue and black. Defense

counsel stated, "I'm satisfied with what you did. I just think she was a little confused with

the blue and the polka dots." *Id.* at 859.

45

The trial court then stated:

> THE COURT: It's so important. ***It's so important for both the State and the Defendant that she's heard everything***.
>
> [Defense Counsel]: I understand.
>
> THE COURT: We'll simply inquire who her doctor is and then I'm going to ask her, too, has she heard all of the evidence and testimony. ***It's kind of hard to know if you've missed something. She's heard what she's heard.***
>
> [Defense Counsel]: Right.
>
> THE COURT: But I'll just ask her if there is [sic] any times that maybe she's turned away and she's missed some of the evidence and testimony. That's all I know to do.
>
> [Solicitor]: Your Honor, ***I don't think there's any way to establish with absolute certainty how much she's hearing,*** and I would suggest just ---
>
> THE COURT: We'll do both.
>
> [Solicitor]: --- that all that's gone on, that just out of an abundance of caution we've got two alternates that are here. Nobody's indicated any sickness or injury or any reason we would need to use those alternates for somebody else. That's why they're here, and ---
>
> THE COURT: If she has heard everything and she doesn't have a hearing problem I just -- I don't want to take her off.

J.A. 859–60 (emphases supplied).

At that point, Juror 342 was called back into the courtroom. The trial court inquired

as follows:

> THE COURT: Ma'am, first of all let me tell you you have done nothing wrong. I simply want to ask you some questions and it is about your hearing because we had addressed that somewhat in your individual voir dire and you said that you had some

46

hearing problems. Have you had any difficulty in hearing what has happened -- let me ask it this way[:] *have you turned away and then found yourself just catching the end of some testimony or not hearing all of it?*

[Juror 342]: *Yes, ma'am.*

THE COURT: You have?

[Juror 342]: Yes, ma'am.

THE COURT: So, you have missed some of the evidence and testimony?

[Juror 342]: No, ma'am, I heard it, but it's more like when I -- after I heard the testimony I turned my head, you know, concentrate on it.

THE COURT: Okay, now, listen carefully to this question. *Have you found yourself maybe turning away and looking and missing part of a question or part of an answer because . . . you didn't turn your head fast enough?*

[Juror 342]: *Yes, ma'am.*

J.A. 860–61. *The trial court then asked Juror 342 if she considered her dress to be blue,*

*and she said, "Yes, ma'am." Id.* at 862. The trial court then further questioned Juror 342:

THE COURT: [L]et me, let me ask you, you have been through one phase of this trial and that is the guilt phase of this trial. Now, did you hear all of the evidence and testimony in that phase?

[Juror 342]: Yes, ma'am.

THE COURT: Did you ever catch yourself missing part of a question or an answer in that phase of the trial?

[Juror 342]: Just at one point I thought I missed a little of it but I didn't. I thought about it and I haven't missed it.

THE COURT: So, you didn't miss anything?

47

[Juror 342]: No, ma'am.

THE COURT: All right, all right, now, at this point is this, is this the phase where you've found yourself turned away and have missed some when we started this part?

[Juror 342]: No, ma'am.

THE COURT: Okay, have you, in fact, turned away and missed some evidence and testimony . . . at this point?

[Juror 342]: *I may have missed a little of it but I didn't miss everything.*

THE COURT: *Okay, all right, so, so, you did miss some at this phase?*

[Juror 342]: *Yes, ma'am.*

THE COURT: Do you believe that you missed any at the guilt phase?

[Juror 342]: No, ma'am.

THE COURT: *Did you find yourself in that same situation where you had turned away and then you've missed some of the question being asked or some of the answer?*

[Juror 342]: *Yes, ma'am, I may have missed concentrating, you know, just steady, may have missed some of it, yes, ma'am.*

THE COURT: *You may have missed some testimony at the guilt phase? Is that what you're saying?*

[Juror 342]: *Yes, ma'am.*

J.A. 862–63. At that point, the State renewed its request to excuse Juror 342.

[SOLICITOR]: *She's admitted that she may have missed evidence at the guilt and the penalty phase and she knows she's got a blue dress on, didn't stand up when Your Honor asked her that, and I think clearly she's, she's not catching*

48

*everything and should be removed*.

THE COURT: All right, yes.

[DEFENSE COUNSEL]: Your Honor, I think if you brought every juror out they would say at one point in time they've missed something. . . . I bet you almost every juror would say, "Yeah, at one point I did miss a little something." We're sitting in this courtroom all day long[.]

J.A. 863–64 (emphasis supplied). The trial court again discussed the matter with counsel, and again they came back to the hearing test based on the blue dress. Defense counsel maintained that Juror 342 was "confused" about the blue dress question and maybe she thought she was "only entitled to stand once." *Id.* at 864–65. Defense counsel also said, "She missed a little something in th[e sentencing] phase, but maybe 11 other jurors missed a little something too." *Id.* at 864. So, the judge proceeded to question Juror 342 yet again:

THE COURT: Ma'am, when I was asking the jurors, when I was asking you all to stand up if you had on a green shirt or stand up if you had a dress on and you stood when I asked you if you had – to stand up if you had a dress on. I also asked for everyone who had on blue to stand. Did you hear that question?

[Juror 342]: Yes, ma'am.

THE COURT: You heard it? Why didn't you stand?

*[Juror 342]: You said -- asking me did I hear it? Oh, no ma'am.*

*THE COURT: You didn't hear when I asked if you have on ---*

*[Juror 342]: No, ma'am.*

*THE COURT: --- blue []?*

*[Juror 342]: No, ma'am.*

49

> **THE COURT: *Okay, and you were looking directly at me and I was talking ---***
>
> **[Juror 342]: *That's why I was trying, I was trying to read your lips when you was like talking.***

J.A. 865–66 (emphasis supplied). The trial court then asked Juror 342 to retrieve contact information for her doctor. While she was out of the courtroom, the trial court said:

> THE COURT: ***Okay, I'm going to note there's no question. She has indicated she just flat did not hear and I was looking directly at her and talking and even now she's having difficulty hearing me and I'm raising my voice and there's been a lot quieter voices than mine during the trial of this matter.***

J.A. 867 (emphasis supplied).

The trial court retreated to chambers and attempted to reach the juror's doctor, to no avail. The court then went on the record to say:

> THE COURT: There has been some conversation in chambers . . . about [Juror 342] and her ability to hear. There's been some indication from both the State and from the Defendant that a belief that all of the jurors can be somewhat distracted at some time and no indication that she has not been able to hear the testimony. The indication has been, in fact, that she has been hearing most and has turned away and only missed bits, but ***she has admitted to missing some [testimony]***.

J.A. 868 (emphasis supplied). The State then began to backtrack on its original concern.[5]

> [SOLICITOR]: Your Honor, although I did on behalf of the

---

[5] As explained below, the Solicitor testified at the evidentiary hearing that Juror 342 was black, and he was concerned about a potential *Batson* challenge if Juror 342 was removed, as Petitioner was also black. *See Batson v. Kentucky*, 476 U.S. 79 (1986) (State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded).

State express some concern about [Juror 342's] hearing problems, the potential problems, in reflecting on this, you know, I started thinking about it and I don't think any, any juror is going to have the capability of getting a hundred percent of the testimony. You're going to have a mix of people that are young and old, some more intelligent than others. Some might have attention deficit problems, and I would note that even a blind juror is qualified to serve in this state, and they obviously are not going to be able to get the same read from a . . . witness that the other jurors could. So, I don't think a hundred percent ability to be, you know, healthy and a hundred percent alert is a qualification per se to serve as a juror. I think [Juror 342] is qualified. She's heard most of what was going on. It would be better if she could hear more, but again, I mean, I think she meets the statutory qualifications as a juror in your discretion. Your Honor, you have qualified her as a juror, and I'm satisfied at this point that she is able to follow the testimony, was able to properly deliberate and would withdraw my motion to have her excused . . . .

THE COURT: All right, anything from the Defense?

[DEFENSE COUNSEL]: Yes, Your Honor, I agree one hundred percent with [the Solicitor] and I also went over all of the ramifications one way or the other with my client and he is perfectly satisfied that she stays on the jury.

J.A. 869–70.

The trial court then confirmed, through a series of questions, that defense counsel and Petitioner were both satisfied with Juror 342 having served in the guilt phase and continuing to serve in the penalty phase. Then, defense counsel called its last mitigation witness, and the sentencing phase proceeded to its conclusion. Jury deliberations began at 3:54 p.m., and a verdict was reached at 5:17 p.m. Petitioner was sentenced to death.

51

B.

Post-Conviction Proceedings

1.

PCR Court Evidentiary Hearing

During the evidentiary hearing in the PCR Court on January 25, 2010, Petitioner called four witnesses: Juror 342's husband, Jimmie Jones; defense trial counsel, Robert Johnston; defense trial counsel Paul Archer; and Solicitor, Walter Bailey. Juror 342 did not testify.

a.

Juror 342's husband

Jones testified that he had been married to Juror 342 for 30 years and that she had been experiencing hearing problems since 1984. In other words, for 20 years at the time of trial. He stated that when he and his wife go to church she likes to sit in the back, but the preacher tells her that she cannot hear and directs her to come to the front. Jones further stated, "***And then he would ask her to read and she still couldn't hear what he was saying. Till I say, he asking you to read. Then she would stand up and read.***" J.A. 1040 (emphasis supplied).

Jones provided several examples of Juror 342's difficulty hearing. He said, "Well, we'll be out in the yard and I'll say, hand me that rake right over there and she'll be about as far as you to me and she don't hear a thing I say. She keep walking." J.A. 1041. When asked whether she would keep walking because she does not want to hear what Jones is saying, he responded:

52

A: Well, she trying to hear what I say but she don't understand it. She just keep walking. And then I guess we're in the kitchen and . . . she said, I need so and so. I said you need this frying pan or something or this skillet, she *keep walking just like she ain't hear me. We're right in the kitchen together.*

*Q: You can be just a few feet apart?*

*A: That's right.*

Q: Okay. Now also you talked about sometimes that she'll be leaving to go somewhere and she'll . . . say like, honey, I'm going, or something like that. Tell the judge about that.

A: Well, a lot of times she get ready to go somewhere and she'll come back and say, I'm fixing to go. I said, well, I heard you, I told you okay. Then she'll come back again and say the same thing again. *She didn't hear what I said to start with.*

Q: She didn't hear you acknowledge her?

A: That's right.

*Id.* at 1041–42 (emphases supplied).  Jones admitted Juror 342 had "*[b]ad trouble with the hearing problem*."  *Id.* at 1042.

But Jones testified that Juror 342 was sensitive about her hearing problem, and that "[s]he get[s] furious" when she is told she needs a hearing aid.  J.A. 1042.  He explained that "she gets mad" because "she don't want to be deaf, she don't want no hearing aid neither."  *Id.* at 1042–43.

b.

Defense Counsel Archer

Petitioner then called one of his trial attorneys, Paul Archer.  Archer testified that *"we all noticed" Juror 342's problem with hearing*.  J.A. 1051.  He agreed that, at some

53

point, Juror 342 "indicated that she used lip reading," and at that time, Archer's opinion was that the trial court "should have removed [her]." *Id*. He testified that after the trial, he thought more about Juror 342's hearing impairment and wondered how she could have effectively participated in deliberations, given the context of group discussion around a table. Based on Archer's conversations with the trial court, and in light of the trial court's persistent questioning of Juror 342, Archer was "under the impression" the trial court was going to order a mistrial, and he was "very surprised" when it did not, despite the fact that neither his team nor the State requested a mistrial. *Id.* at 1052–53.

On cross examination, Archer admitted "in retrospect when I read the transcript ***there's no doubt that [Juror 342] did not belong on that jury***." J.A. 1074 (emphasis supplied). When asked whether this was something he decided in hindsight, he answered, "Not necessarily. I was busy with other things [in the trial], but I did weigh into the fact that she was a person of color." *Id*. He continued, "I don't think we particularly cared for the alternate, but I don't think the alternate came into [it because] in the penalty phase [Juror 342] already voted," but he said, "I should have made a motion . . . for a mistrial, definitely," and "if I made a motion for a mistrial [the trial court] would have granted it." *Id.* at 1074–75.

Then, the PCR Court asked counsel, "[W]hy did y'all argue so strenuously on the record to keep her on the jury . . . if you had been offered a mistrial?" J.A. 1077. Archer responded, "[W]e were a little angry about the way the jury was picked . . . And it just so happened that the people we wanted -- and also []race played a factor -- they were all in the end [jury] pools, and [the Solicitor] picked up on it real quick. . . . [O]n the last pools

54

were . . . some black people that we wanted [and the trial court] wouldn't let the[ jurors] come in front of us." *Id.* at 1077–78. But Archer concluded, "At least we got something from that the way the jury was picked[.] [W]e got some black person there," even though "[i]t's not exactly who we wanted." *Id.* at 1078–79. "[B]ut I don't think [Juror 342 being black] outweighs the fact that she was deaf." *Id.* at 1079. He said, "[I]f [Juror 342] were a white woman there's no doubt . . . I would have done it differently, but at least we got one black on the jury." *Id.* at 1081. Nonetheless, ***Archer reiterated Juror 342 "should have never been on that jury."*** *Id*. at 1083.

c.

Defense Counsel Johnston

Robert Johnston, who also served as defense counsel in the state court trial but in more of an assistant role, testified that Archer "was handling" the juror issue. J.A. 1026. When asked whether he discussed the trial court's concerns and the prospect of asking for a mistrial with Archer, Johnston replied that he did not "specifically recall any conversations with [Archer]." *Id.* at 1001. Johnston had "a recollection that there was an offer [from the trial court] to the extent that if somebody will ask me for [a mistrial] I'll grant it." *Id.* at 1027. He testified that when Juror 342's hearing problems were being discussed, he "felt that a mistrial might be a good idea." *Id.* at 994.

d.

Solicitor Bailey

Finally, Solicitor Walter Bailey testified about his involvement in the state court trial. When asked whether there was discussion of a mistrial, Bailey said:

55

A: Well, it was an ongoing thing that led up to that with the --
this person's hearing loss and the judge and the attorneys tried
to ascertain the extent of the hearing loss and what impact that
might have had on ability [sic] to be a juror. And at some -- at
some point the issue did come [sic] if she did decide -- by then
we were in the penalty phase.

Q: Right.

A: The issue came up if the judge decided that juror was not
qualified at that point in time[,] the penalty phase, then what
will that do to the verdict.

Q: Right.

A: Yeah, that did come up.

Q: And did you ever hear [the trial court] just flatly say to the
defense or to you that if you requested mistrial I'll give it?

A: I don't recall that at all.

J.A. 1087–88. Bailey explained he changed course from moving to excuse the juror because she could not hear to keeping her on the jury because he was "trying to protect the record" and was "concerned about the fact that . . . the defendant was a black male [and] [t]he juror was a black female. There are mostly white jurors on there, and that if [Juror 342] was removed and replaced with a white alternate it could create . . . a *Batson*-type situation." *Id.* at 1088–89.

Bailey testified that, although Juror 342 had disclosed her hearing issue on her questionnaire, and "***everyone knew that she did have the hearing loss***," it was "hard to get a grasp on how bad it was or how large one [sic] it may have been. It was difficult to determine because she kept insisting she was able to hear and follow the testimony, but then she would admit that she did miss out on certain things." J.A. 1089 (emphasis

56

supplied).  Regarding his abandoned request to excuse Juror 342, the Solicitor stated, "I think everybody recognized that you don't have to be a perfect specimen to be on a jury. You can be blind. You can have other impediments. And we never crossed to that point where anybody decided that she was not qualified[.]" *Id.* at 1090.

On cross-examination, Bailey testified that he "went back and forth" with his concerns about Juror 342, explaining that his concerns were alleviated when she told the trial court she could hear everything, "then there would be maybe another test or another indication that she wasn't hearing well and I would begin to wonder." J.A. 1093–94.

e.

Affidavit

Petitioner also filed an affidavit from Juror 342's physician, stating that in July of 2006 (21 months after trial), Juror 342 "informed [him], in the course of [his] medical examination of [Juror 342], that she suffered from deafness." J.A. 962.  By his "medical experience," he determined she "suffered from deafness", was "partially deaf, and "should never have served on a jury without an appropriate accommodation for her hearing impairment." *Id.*

2.

PCR Court Decision

In denying relief to Petitioner in a formal order, the PCR Court made the following findings:

> This Court finds that Juror [342] was qualified to serve on the jury without objection. Juror [342] ***testified she heard all testimony during the guilty phase and was able to compensate***

57

*for her hearing deficiencies*. The trial court also took specific measures to ensure that Juror [342] was able to hear the testimony. Additionally, South Carolina Courts have held that a person who has difficulty hearing is not per se disqualified from serving as a juror. *Safran v. Meyer*, 103 S.C. 356, 364, 88 S.E. 3, 4 (1916).

This Court finds there was ***not a sufficient showing that [Juror 342] missed material testimony at trial or that her hearing difficulty was of such degree as to indicate she missed material*** [sic]. Therefore, this due process claim is denied.

J.A. 1275 (emphases supplied).[6]

### C.

#### District Court Decision

Although the magistrate judge recommended granting summary judgment for the State on all claims, the district court disagreed as to Ground One (due process violation based on the presence of Juror 342 on the jury) and Ground Two (ineffective assistance of counsel based on the juror issue).

As to Ground One, the district court found the PCR Court's factual findings to be unreasonable pursuant to § 2254(d)(2), explaining, "[E]ven affording the trial judge and the PCR Court all the appropriate deference, the undersigned concludes that their finding

---

[6] The majority also quotes from the PCR Court's oral findings, which are substantially similar. *See ante* at 6–7. There, the PCR Court found that Juror 342 "did have some hearing deficiencies[.] She had a problem with hearing in the right ear," but "she could hear." J.A. 1183. It also found, "There is no question but that she had some problem with hearing, however, she was able to compensate for that by reading the lips of the particular witness[.] She specifically testified . . . during one of the inquiries conducted by the trial judge that she had, indeed, heard all of the testimony thus far in the sentenc[ing] phase." *Id*.

58

Juror 342 competent for continued jury service in light of her incapacitating hearing impairment was 'sufficiently against the weight of the evidence that it [was] objectively unreasonable.'" *Bryant v. Stirling*, No. CV 1:13-2665-BHH, 2019 WL 1253235, at *16 (D.S.C. Mar. 19, 2019) (quoting *Williams v. Stirling*, 914 F.3d 302, 312 (4th Cir. 2019)). The district court continued,

> It is perfectly clear from the record that the trial judge had concerns about Juror 342's ability to hear *throughout the trial*. This is demonstrated by the fact that [the trial judge] spontaneously began questioning the jury, and specifically Juror 342, about hearing difficulties after seven of the State's twenty-eight fact witnesses had testified. It is also clear that Juror 342 failed to advise the trial court, the solicitor, or Petitioner's trial counsel that she needed to read lips in order to assist her with understanding testimony. This was material information regarding her capacity as a juror, which was only haphazardly discovered as a result of the trial judge's *sua sponte* questioning, *well after the parties and the trial court deemed her a qualified juror*, and after—by the trial judge's description—"plenty of times" when witnesses on the stand and/or examining counsel turned away from the jury box.

*Id.* at *17 (citation omitted) (emphases in original). It also noted, "Whatever demeanor and body language the trial judge and solicitor observed that led them to initiate such an inquiry surely went beyond the typical distraction or temporary lack of focus that every juror suffers from time to time." *Id.*

## II.

Ground One of Petitioner's habeas petition alleges that Petitioner was denied his right to a fair trial before an impartial jury in violation of the Sixth, Eighth, and Fourteenth Amendments because he was convicted and sentenced to death by a hearing impaired juror who did not hear portions of the trial testimony. For the following reasons, I would affirm habeas relief on this count.

## A.

### Section 2254(d)(2)

### 1.

### Legal Background

Section 2254(d)(2) provides that habeas relief may not be granted unless the adjudication of the state law claim at issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"For a state court's factual determination to be unreasonable under § 2254(d)(2), it must be more than merely incorrect or erroneous. It must be sufficiently against the weight of the evidence that it is objectively unreasonable." *Winston v. Kelly*, 592 F.3d 535, 554 (4th Cir. 2010) (citing *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). However, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." The Supreme Court has held that § 2254(d)(2) and (e)(1) are "independent requirements" in federal habeas review.

*Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003).  Therefore, "[t]o secure habeas relief, [a] petitioner must demonstrate that a state court's factual finding was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), *and* that it was objectively unreasonable in light of the record before the court."  *Winston*, 592 F.3d at 555 (alterations and internal quotation marks omitted) (emphasis in original).

In analyzing the factual determinations made by the PCR Court, we must "train our attention on the . . . underlying factual determinations on which the [state] court's decision was premised."  *Brumfield v. Cain*, 135 S. Ct. 2269, 2276 (2015).  On federal habeas review, we must uphold a state court factual determination when, "[r]eviewing all of the evidence," the state court's decision, "even if it is debatable, . . . is not unreasonable."  *Wood v. Allen*, 558 U.S. 290, 303 (2010).  Although "the term 'unreasonable' is no doubt difficult to define . . . [i]t suffices to say . . . that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."  *Id.* at 301 (alteration and internal quotation marks omitted).  Finally, "federal habeas courts have no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.  Rather, for a federal habeas court to overturn a state court's credibility judgments, the state court's error must be stark and clear."  *Merzbacher v. Shearin*, 706 F.3d 356, 364 (4th Cir. 2013) (citations and internal quotation marks omitted).

2.

Application

The PCR Court's analysis on the relevant point -- that is, Petitioner was denied his right to a fair trial by the presence of a hearing impaired juror -- is two short paragraphs. Without much analysis, the PCR Court determined Juror 342 "was qualified" to serve on the jury; that she "testified she heard all testimony during the guilty phase"; that with the help of the trial court, she "was able to compensate for her hearing deficiencies"; that she "was able to hear the testimony"; and that there "was not a sufficient showing that [she] missed material testimony" or that her "hearing difficulty was of such degree as to indicate she missed material [testimony]." J.A. 1275. The district court concluded the "PCR Court's factual findings were unreasonable, and [Petitioner] has shown as much by clear and convincing evidence." *Bryant*, 2019 WL 1253235, at *16.

a.

District Court's Purported Missteps

The majority concludes that the district court did not give proper deference to the PCR Court's decision and improperly made its own factual findings. *See ante* at 8–9 (citing *Bryant*, 2019 WL 1253235, at *17 (district court observing "Juror 342 was either unwilling or incapable of volunteering the undisputed truth that she was having difficulty hearing"); *id.* at *21 (district court "ultimately express[ing] agreement" with Appellee's assertion that Juror 342 was 'functionally deaf'")). In deeming the PCR Court's analysis reasonable, the majority cites examples in the record of times when Juror 342 could hear and responded

62

appropriately, suggesting that the district court ignored or failed to give weight to these instances where Juror 342 was hearing clearly.

I disagree. The district court did not violate AEDPA principles in its decision. Rather, the district court's analysis was grounded firmly in the record evidence. First, looking at the full context of the district court's "unwilling or incapable" passage, the district court actually stated:

> [E]ven though the trial judge gave the jury specific instructions, including a particular hand signal, about what to do if they were having trouble hearing, there is no indication that Juror 342 ever once availed herself of this hand signal, even though she admitted trouble hearing numerous times in response to *judge-initiated* questioning.

*Bryant*, 2019 WL 1253235, at *17 (emphasis in original). Based on this correct reading of the record, the district court inferred that "it seems Juror 342 was either unwilling or incapable" of telling the trial court that she had difficulty hearing. *Id.* This inference is also supported by Jones's testimony that Juror 342 was sensitive about her hearing problem; "[s]he get[s] furious" when she is told she needs a hearing aid; and "she gets mad" because "[s]he don't want to be deaf, she don't want no hearing aid neither." J.A. 1042–43. Thus, the district court was not finding its own facts. It was doing its job -- that is, looking at "the weight of the evidence" to determine if the PCR Court's factual findings were "objectively unreasonable." *Winston*, 592 F.3d at 554.

Moreover, the district court did not make a finding that Juror 342 was "functionally deaf"; rather, the district court noted fleetingly that Appellee had suggested as much in his

objections to the magistrate judge's recommendation, and it "agree[d]" generally with the objections Appellee made. *Bryant*, 2019 WL 1253235, at *21.

But even if the district court should not have surmised that "it seem[ed]" Juror 342 was "unwilling or incapable" of admitting she could not hear at certain points, or should not have suggested Juror 342 was "functionally deaf," on de novo review of the district court's decision, I would nonetheless conclude the PCR Court's findings were "sufficiently against the weight of the evidence" such that they were "objectively unreasonable." *Williams*, 914 F.3d at 312.

b.

PCR Court's Findings Sufficiently Against the Weight of the Evidence

The PCR Court ignores the fact that the trial court had concerns about Juror 342's hearing from the inception of the trial,[7] and that throughout the entirety of the trial, these concerns continued. The trial court conducted several hearing tests, some of which Juror 342 failed, and *after* the trial court deemed her qualified to serve at voir dire, Juror 342 herself admitted that she had to read lips. Finally, after several attempts to discern how well Juror 342 could hear, the trial court concluded, "[T]here's no question. She has indicated she just flat did not hear" at a time when the trial court was "looking directly at her and talking [and] raising [its] voice," and even the trial court admitted there had been

---

[7] The trial court granted the State's motion to incorporate the guilt phase testimony into the penalty phase. *See* J.A. 219 ("[A]ll of you may consider[,] as well as the additional testimony and evidence that you will hear in this [penalty] phase[,] all of the evidence and testimony that was presented in the first [guilt] phase of this trial.").

"a lot quieter voices than mine during the trial of this matter." J.A. 867. This is a crucial admission. And Juror 342 herself admitted several times that she may have missed "some testimony" at trial. J.A. 863; *see, e.g.*, *id.* at 861 (Juror 342 admitting she "found [her]self maybe turning away and looking and missing part of a question or part of an answer because [she] didn't turn [her] head fast enough"); *id.* at 862 (Juror 342 admitting she "may have missed a little of [the evidence and testimony]"); *id.* at 863 (Juror 342 admitting she "may have missed some of [the questions being asked]"); *see also id.* (Solicitor explaining that Juror 342 "admitted that she may have missed evidence at the guilt and the penalty phase"). This is directly contradictory to the PCR Court's finding that Juror 342 "testified she heard all testimony." J.A. 1275.

And it was not only the trial court who noticed the issue. Until nearly the end of the penalty phase, the Solicitor urged the court to reassess Juror 342's hearing. He referred to her "apparent deafness"; noted she was unable to "follow all the testimony"; and moved for Juror 342 to be excused due to her inability to hear. *Id.* at 853. Further, the testimony in the PCR Court by defense counsel was that Juror 342 "should have never been on that jury." *Id*. at 1083. Even Juror 342's own husband admitted "she has had hearing problems . . . [s]ince" around 1984 (which necessarily means up to and including the time of trial), and that she sometimes did not hear things he said when he was in the same room with her just a few feet away. He also testified that she "get[s] furious" when she is told she needs a hearing aid because "[s]he don't want to be deaf, she don't want no hearing aid neither." *Id.* at 1042–43. Corroborating this testimony was an affidavit by Juror 342's physician, stating that in July of 2006 (21 months after trial), Juror 342 "informed [him], in the course

65

of [his] medical examination of [Juror 342], that she suffered from deafness." *Id.* at 962.

By his "medical experience," he determined she "suffered from deafness," was "partially

deaf," and "should never have served on a jury without an appropriate accommodation."

*Id.*

In my view, the weight of the evidence demonstrates that Juror 342's deafness

interfered with her hearing the evidence at trial, in direct conflict with the PCR Court's

findings. This evidence is plentiful and includes:

- At voir dire, Juror 342 was told twice to bring clothes for 10 days, but she did not do so. The trial court was concerned "[s]he didn't hear me say that she was to pack her bags for ten days."

- At the guilt phase, after hearing for the first time that Juror 342 had to read lips and after seven witnesses had already testified, the trial court recognized there had been "plenty of times [witnesses] ha[d] turned away."

- In the middle of the guilt phase, the trial court had "some concerns about the one juror who is lip reading," and the issue did not "come to our attention until recently."

- Although during one hearing test in the penalty phase, Juror 342 stood at the proper time, the Solicitor was concerned another juror nudged her.

- During the penalty phase, the Solicitor "d[id]n't think [Juror 342 was] catching all [the testimony]."

- During the penalty phase, the trial court admitted it "had [its] concerns" about Juror 342's hearing. The Solicitor also "continue[d] to be concerned about her apparent deafness and inability to follow all the testimony."

- During the penalty phase, the trial court noticed "some things that have . . . caused the Court some concern," including that at times,

66

"it looks like maybe she's . . . not watching back and forth and she's not able to hear."

- During another hearing test, although Juror 342 stood at the appropriate time when the trial court asked for those wearing skirts or dresses to stand, she then ***did not*** stand at the appropriate time when the court asked for those wearing blue to stand. When the trial court later asked Juror 342 if she considered her dress to be blue, she said "Yes ma'am," and explained she could not hear the trial court's direction because she "was trying to read [the judge's] lips."

- The trial court acknowledged, "It's kind of hard to know if you've missed something," and the Solicitor believed there was no way "to establish with absolute certainty how much she's hearing."

- Juror 342 admitted she "turned away and then found [her]self just catching the end of some testimony or not hearing all of it."

- Juror 342 admitted she "found herself . . . turning away and looking and missing part of a question or part of an answer because [she] didn't turn [her] head fast enough."

- Juror 342 admitted she "may have missed a little of" the testimony at the penalty phase.

- Juror 342 admitted she "may have missed some testimony at the guilt phase."

- At the penalty phase, the Solicitor stated, "[C]learly she's . . . not catching everything and should be removed." The trial court said, "[T]here's no question. . . . [S]he just flat did not hear [when] I was looking directly at her and talking," when the court was "raising [its] voice" and when "there [had] been a lot quieter voices . . . during the trial."

- The trial court stated, "[S]he has admitted to missing some [testimony]."

- Juror 342's husband testified Juror 342 had had a hearing problem since 1984. He testified she could sometimes not hear him when they were "just a few feet apart" in the kitchen together.

67

- Her husband testified that she "still couldn't hear" their preacher, even when she moved to the front of the church.

- Her husband testified Juror 342 had "bad trouble" with hearing and did not want to wear a hearing aid. He further testified that she "get[s] furious" when the accommodation is suggested because she does not want to be deaf.

- Petitioner's trial counsel admitted "there's no doubt that [Juror 342] did not belong on that jury."

- The Solicitor testified that "everyone knew" Juror 342 had hearing loss.

- Petitioner's physician submitted an affidavit in 2006 saying Juror 342 "suffered from deafness" and was "partially deaf."

Yet, the PCR Court ignored and/or disregarded all of this evidence, with no explanation. Instead, it made a finding that Juror 342 testified she "heard all the testimony" in the guilt phase, J.A. 1275, and the penalty phase, *see id.* at 1183. This finding is directly contrary to the evidence.

Moreover, the PCR Court determined Juror 342 "was able to compensate for her hearing deficiencies," and the trial court "took specific measures to ensure that Juror [342] was able to hear the testimony," but does not explain how this was so. If the PCR Court was talking about lip reading, the weight of the evidence reveals that her lip reading ***did not***, in fact, compensate for the hearing deficiencies. First of all, the trial court did not discover Juror 342 was lip reading until well into the guilt phase, after seven witnesses had already testified. And in any event, the trial court discovered that even if someone was looking directly at Juror 342 and speaking, she still could sometimes not read the lips or hear what was being said. *See id.* at 867 ("She has indicated she just flat did not hear and

68

I was looking directly at her and talking . . . .").  The trial court's attempted use of hand signals to communicate trouble hearing is even less supportive of the PCR court's compensation conclusion because Juror 342 never used them.  She only volunteered that she missed testimony in response to the trial court's questioning, at which point it was too late to remedy the problem.  Thus, the weight of the record evidence entirely fails to demonstrate successful compensation of hearing deficiencies.

The majority credits the PCR Court's finding that Petitioner did not sufficiently demonstrate that Juror 342 missed "material" testimony.  *Ante* at 19 ("The record further shows that Juror 342 testified that she missed only 'some' testimony, and there is no indication that that included any *material* testimony." (emphasis in original)).  But there is no basis in the law to require such a showing.  With good reason.  How could a juror who did not hear material testimony assure the trial court that she did not hear material testimony?  It makes no sense to expect her to be able to relate what she ***did not hear***.  The trial court said it best when it said:  "It's kind of hard to know if you've missed something.  She's heard what she's heard."  J.A. 859.

In addition, the majority reasons that because Juror 342 passed some hearing tests and could "generally" converse with the trial court, "the postconviction court's factual finding that Juror 342's lip-reading accommodation generally worked and that her hearing impairment was not so severe that she *must* have missed material testimony" is sound.  *Ante* at 19.  To begin with, the majority's assertion that Juror 342 could "generally" converse with the trial court fails to support any of the PCR Court's findings.  Throughout the record, Juror 342's interactions with the trial court demonstrate that she required significant follow

69

up and clarification to reach a common understanding. *See, e.g.*, J.A. 106 (THE COURT: "Okay, now, you've answered me both ways and *I need to clarify this like I've done on some of these others.*" (emphasis supplied)). Because no such clarification took place during witness testimony, Juror 342's ability to "generally" converse with the trial court is of little to no relevance when evaluating how much testimony she must have heard.

Furthermore, the majority misstates what the PCR Court found. It found Juror 342 "testified she heard all testimony" in the guilt phase and the sentencing phase, *see* J.A. 1275, 1183, and was able to "compensate" for her hearing deficiency, *id.* at 1275 -- not that the lip-reading "generally worked." Plus, there is no logic in claiming that someone utilizing a hearing accommodation which only "generally" works would not miss "*any material testimony*" when such material testimony is necessarily pervasive. *Ante* at 19 (emphasis supplied). In the sentencing phase of a death penalty trial where an individual's life is at stake, I would think all the testimony is material.

For these reasons, the PCR Court's decision relied on an unreasonable determination of facts, and the presumption of correctness of the state court's findings is rebutted by clear and convincing evidence.

B.

Section 2254(d)(1)

The majority recognizes, and I agree, that Appellee's argument regarding unreasonable application of clearly established federal law pursuant to § 2254(d)(1) "actually reduces to a fact question." *Ante* at 21. I do note, however, that "[i]f we determine, considering only the evidence before the state court, that . . . the state court's

decision was based on an unreasonable determination of the facts, we evaluate the claim de novo . . . ." *Hurles v. Ryan*, 752 F.3d 768, 778 (9th Cir. 2014); *see also Dodson v. Ballard*, 800 F. App'x 171, 179 (4th Cir. 2020) (per curiam) ("Because the state supreme court's decision was based on an unreasonable determination of fact, which led to this unreasonable application of federal law, our review is not barred by AEDPA," and "we now examine [the claim] de novo."); *see Austin v. Plumley*, 565 F. App'x 175, 184–85 (4th Cir. 2014) (per curiam) ("[T]he weight of the authority establishes that we should . . . decline to apply AEDPA deference when a petitioner satisfies § 2254(d)(2)." (collecting cases)); *cf. Panetti v. Quarterman*, 551 U.S. 930, 953–54 (2007) (pursuant to § 2254, considering petitioner's claim "without deferring to the state court's finding" where "the factfinding procedures upon which the court relied were not adequate for reaching reasonably correct results" (internal quotation marks omitted)).

Reviewing Ground One without regard to AEDPA deference, I would readily affirm habeas relief because the failure of the trial court to remove a juror who clearly was hearing impaired and could not hear all of the trial testimony in a capital case violated Petitioner's Sixth, Eighth, and Fourteenth Amendment rights.

The Sixth Amendment right to a jury trial requires "a fair trial by a panel of impartial, indifferent jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal quotation marks omitted). The Supreme Court has recognized that a defendant has a right to "a tribunal both impartial and mentally competent to afford a hearing." *Jordan v. Massachusetts*, 225 U.S. 167, 176 (1912); *see Tanner v. United States*, 483 U.S. 107, 127 (1987) (recognizing a defendant's Sixth Amendment interest in an "unimpaired jury").

71

And in capital cases, "[b]elief in the truth of the assumption that sentencers treat their power to determine the appropriateness of death as an 'awesome responsibility' has allowed this Court to view sentencer discretion as consistent with -- and indeed as indispensable to -- the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.'" *Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985) (quoting *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976)). Further, South Carolina law requires that "no person is qualified to serve as a juror in any court in this State if . . . [h]e is incapable by reason of . . . physical infirmities to render efficient jury service." S.C. Code Ann. § 14-7-810(3).

Based on the above analysis and proper account of the facts, the trial court's refusal to remove Juror 342 violated Petitioner's right to a fair and impartial jury, and ultimately, his right to be free from the death penalty. In my view, the particulars of the testimony she missed (which is largely unascertainable) does not matter as much as the *extent* of what she missed. The evidence in the record amply demonstrates her hearing deficiency was pervasive: at voir dire, she did not even know that she was supposed to pack clothes for 10 days, despite the fact that the trial court told her twice; at the guilt phase, she admitted (after seven witnesses had already testified) that she had to read lips, and the trial court stated that "there's been plenty of times that the[] [witnesses] have turned away," meaning Juror 342 could not read the lips of witnesses "plenty of times"; and at the penalty phase, Juror 342 failed a hearing test and admitted she missed evidence and testimony in the penalty phase, where Petitioner himself testified and presented numerous character and mitigation witnesses in an effort to save his own life.

Therefore, reviewing the record outside of the AEDPA framework, I would affirm the district court's determination that Petitioner's rights were violated, and remand to state court for a new sentencing hearing.

III.

The strictures of AEDPA are "demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). In this case, where the PCR Court made unreasonable determinations of fact, "[d]eference does not by definition preclude relief." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

I would affirm.